MAIN, Judge.[1]
The appellant, Tierra Capri Gobble, was convicted of murdering her four-month-old son Phoenix Parrish, an offense defined as capital by § 13A-5-40(a)(15), Ala. Code 1975, because Phoenix was under the age of 14. The jury recommended, by a vote of 10 to 2, that Gobble be sentenced to death. The circuit court followed the jury’s recommendation and sentenced Gobble to death.
The State’s evidence established the following. On December 15, 2004, Phoenix was rushed to the emergency room of the Southeast Alabama Medical Center in Do-than. He was not breathing and had no pulse. Attempts to resuscitate him were unsuccessful, and he was pronounced dead shortly after he was brought to the hospital. The autopsy showed that Phoenix died as a result of blunt-force trauma to his head — Phoenix’s skull had been fractured. Phoenix had numerous other injuries, including fractured ribs, a fracture to his right arm, fractures to both wrists, multiple bruises on his face, head, neck, and chest and a tear in the inside his mouth that was consistent with a bottle having been shoved into his mouth.
Gobble gave birth to Phoenix on August 8, 2004, in Plant City, Florida. The child *936 was taken from her custody by the Florida Department of Children and Families (“DCF”) within 24 hours after his birth because of DCF’s involvement with Gobble’s first child, Jewell, who was 18 months old at the time of Phoenix’s death. Jewell had been removed from Gobble’s custody in December 2003 by DCF and placed with her paternal uncle — Edgar Parrish. At the time of Phoenix’s death Gobble was under a court order to have no contact with her children.[2] However, Gobble and her boyfriend, Samuel David Hunter, moved in with Phoenix, Parrish, and Walter Jordan in October 2004. In October 2004, Gobble signed an affidavit stating her intent to terminate her parental rights. On December 2, 2004, proceedings were initiated to terminate Gobble’s parental rights.
In the early morning hours of December 15, 2004, Gobble was having trouble getting Phoenix to go to sleep because he was “fussin.” At around 1:00 a.m. Gobble went to feed him. After he finished his bottle, she put him back in his crib. At around 9:00 a.m. Gobble checked on Phoenix and found him playing. Gobble went back to sleep and awoke at approximately 11:00 a.m. When she went to check on Phoenix she discovered that he was not breathing. Gobble called Jordan, who was also in the trailer that morning. Jordan went to get Parrish, who was nearby. Parrish returned to the trailer and telephoned emergency 911. When paramedics arrived, Phoenix was unresponsive, and they rushed him to a local hospital.
Dr. Jonas R. Saíne, the emergency room doctor who treated Phoenix at Southeast Alabama Medical Center, testified that “[Phoenix] had bruises, contusions, on his face, scalp, and chest. They were everywhere.” (R. 436.) The x-rays showed that Phoenix had a skull fracture, fractures to both wrists, and a fracture to his right upper arm. Dr. Saíne testified that it takes “quite a bit of trauma and quite a bit of force” to fracture a skull. (R. 441.) The autopsy report, admitted by agreement of the parties, showed that Phoenix also had fractures to several of his ribs. Dr. Saíne testified that Phoenix would have been in tremendous pain from any of the numerous injuries.
Officer Tracy McCord of the Houston County Sheriffs Department testified that Gobble was taken into custody several hours after Phoenix was taken to the hospital and was questioned by police. Gobble told McCord that she was Phoenix’s primary caretaker even though Parrish was his guardian, that she would occasionally get frustrated with him when he would not go to sleep, that she could have broken his ribs from holding him too tightly, and that when she was holding Phoenix she leaned down in the crib to get his blanket quickly and Phoenix’s head might have struck the side of the crib at that time.
Tori Jordan testified that she had known Gobble for about two or two and one-half years and that she had periodically babysat for Jewell over a period of about five months. She said that Gobble had told her that “if she couldn’t have [her children], no one could.” (R. 256.)
Gobble testified in her own defense and portrayed Hunter as abusive and domineering. She also testified that she was the primary caretaker for the children, that she was under a court order to not be around her children, and that several days *937 before his death she noticed that Phoenix had bruises on his body, but, she said, she did not do anything because she was scared. Gobble further testified that she was the only person to have contact with Phoenix for the 10 hours immediately preceding his death. She did not telephone 911 when she realized he was not breathing, she said, because she did not want to get into trouble. During her cross-examination, the State introduced a letter written by Gobble in which she wrote that she was responsible for Phoenix’s death. In the letter Gobble writes: “It’s my fault that my son died but I didn’t mean for it [to] happen.” (C. 1979.)
The jury convicted Gobble of capital murder. A presentence report was prepared and a separate sentencing hearing was held. The jury recommended, by a vote of 10 to 2, that Gobble be sentenced to death. The circuit court followed the jury’s recommendation and sentenced Gobble to death. This appeal, which is automatic in a case involving the death penalty, followed. See § 13A-5-5S(a), Ala.Code 1975.

Standard of Review

Because Gobble has been sentenced to death this Court must review the lower-court proceedings for plain error. Rule 45A, Ala.R.App.P., states:
“In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant.”
In discussing the scope of the plain-error rule we have stated:
“ ‘Plain error’ has been defined as error “‘so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.”’ Ex parte Womack, 435 So.2d 766, 769 (Ala.1983), quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981). ‘To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s “substantial rights,” but it must also have an unfair prejudicial impact on the jury’s deliberations.’ Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000). This Court has recognized that ‘“[t]he plain-error exception to the contemporaneous-objection rule is to be ‘used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.’ ” ’ Burton v. State, 651 So.2d 641, 645 (Ala.Crim.App.1993), aff'd, 651 So.2d 659 (Ala.1994), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting in turn United States v. Frady, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).”
Brooks v. State, 973 So.2d 380, 387 (Ala.Crim.App.2007). Although Gobble’s failure to object will not bar this Court’s review of any issue, it will weigh against any claim of prejudice Gobble makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991).

Guilt-Phase Issues

I.
Gobble asserts that the circuit court erred in denying her motion for a change of venue because, she argues, the publicity surrounding the case was extensive and prejudiced her ability to obtain a fair jury pool in Houston County.
The record shows that Gobble moved for a change of venue and that a lengthy pretrial hearing was held on the motion. At the hearing Gobble presented the testi *938 mony of Natalie Davis, a professor of political science at Birmingham Southern College and the owner of Davis and Associates, a jury-consulting firm. Davis testified that her firm conducted a survey of Houston County residents by telephone and spoke to 340 individuals. She said that of those individuals 57% had heard about the case. Those individuals who had heard about the case were then asked if they believed Gobble was guilty or not guilty. Davis testified that 46.5% said that Gobble was either guilty or probably guilty; however, 50.6% refused to answer the question.
Gobble also presented the testimony of Lauren Davis, the custodian of records for WTVY television station; Wayne May, the custodian of records for Channel 4 television station; Ken Curtis, the custodian of records for WDHN television station; La-tanya Smedley, the custodian of records for the Dothan Eagle newspaper; and John Daniels, the custodian of records for WOOF radio station. The videotapes of coverage of the case by WSFA, Channel 12, were admitted into evidence by stipulation'. May, Curtis, and Daniels testified that in their opinion the media coverage of Phoenix’s murder was no greater than the coverage in any other murder case.
When reviewing a trial court’s ruling on a motion for a change of venue, we apply the following principles:
“A trial court is in a better position than an appellate court to determine what effect, if any, pretrial publicity might have in a particular case. The trial court has the best opportunity to evaluate the effects of any pretrial publicity on the community as a whole and on the individual members of the jury venire. The trial court’s ruling on a motion for a change of venue will be reversed only when there is a showing that the trial court has abused its discretion. Nelson v. State, 440 So.2d 1130 (Ala.Cr.App.1983).
“Rule 10.1(a), Ala.R.Crim.P., provides that a ‘defendant shall be entitled to a change of the place of trial to the nearest county free from prejudice if a fair and impartial trial and an unbiased verdict cannot be had for any reason.’ The burden of proof is on the defendant ‘to show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to be tried.’ Rule 10.1(b).
“ ‘[A] change of venue must be granted only when it can be shown that the pretrial publicity has so “pervasively saturated” the community as to make the “court proceedings nothing more than a ‘hollow formality,’” Hart v. State, 612 So.2d 520, 526-27 (Ala.Cr.App.), affirmed, 612 So.2d 536 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993), citing Rideau v. Louisiana, 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963), or when actual prejudice can be demonstrated. The burden of showing this saturation of the community or actual prejudice lies with the appellant. Sheppard, v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). In order to show community saturation, the appellant must show more than the fact “that a case generates even widespread publicity.” Thompson v. State, 581 So.2d 1216, 1233 (Ala.Cr.App.1991), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992). “ ‘Newspaper articles alone would not necessitate a change of venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, accusational or den- *939 unciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [1945].’ ” Thompson v. State, supra at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala.Cr.App.), cert. denied, 353 So.2d 35 (Ala.1977). Furthermore, in order for a defendant to show prejudice, the “ ‘proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.’ Anderson v. State, 362 So.2d 1296, 1299 (Ala.Cr.App.1978).” Ex parte Grayson, 479 So.2d 76, 80 (Ala.1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985).’”
Joiner v. State, 651 So.2d 1155, 1156 (Ala.Crim.App.1994), quoting Oryang v. State, 642 So.2d 979, 983 (Ala.Crim.App.1993).
We have reviewed the transcripts of the radio, television, and newspaper coverage related to this case and we do not find them inflammatory or sensational. “Newspaper stories that are not inflammatory or sensational do not warrant a change of venue.” Thompson v. State, 581 So.2d 1216, 1234 (Ala.Crim.App.1991). “ ‘The proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.’ ” Ex parte Grayson, 479 So.2d 76, 80 (Ala.1985). During voir dire Gobble made four challenges for cause based on comments by prospective jurors concerning their knowledge of the case. All four of the challenges were granted by the trial court. There is no indication that the circuit court abused its discretion in denying Gobble’s motion for a change of venue. See Joiner, supra.
II.
Gobble next argues that the circuit court erred in denying her motion for a continuance so that she could secure the testimony of a second pathologist.
On August 18, 2005, Gobble moved to continue the trial, which had been set for September 12, 2005. This motion asserted only general grounds. At a pretrial hearing on August 19, 2005, Gobble stated that she needed a continuance to secure the testimony of an expert who specialized in “brittle bone syndrome” to explore the possibility that Phoenix had this disease. Gobble retained the services of a pathologist.
On September 9, 2005, three days before the trial was scheduled to begin, Gobble moved for a continuance after the pathologist that Gobble had retained, Dr. George McCormick, withdrew from the ease because of a scheduling conflict. Gobble’s counsel cited to no specific testimony the expert was expected to present at trial. (C. 207.) At the hearing on the- motion, the circuit court questioned counsel as to why he had waited so long to request the continuance and why he had not spoken to the State’s pathologist. After noting that the court had previously informed counsel to be prepared to try the case in August, that they should work diligently, and that they should not ask for a continuance for an expert at the last minute, the circuit court denied the motion.
“ ‘[I]n Alabama, our courts have always held it is discretionary with the trial court whether it should halt or suspend the trial to enable a party to secure or produce witnesses in court.... And, in the exercise of that discretion the trial court is not to be reversed save for gross abuse of discretion.’ Alonzo v. State ex rel. Booth, 283 Ala. 607, 610, 219 So.2d 858, 861, cert. denied, 396 U.S. 931, 90 S.Ct. 269, 24 L.Ed.2d 229 (1969). In Ex parte Saranthus, 501 So.2d 1256 (Ala.1986), the Aa- *940 bama Supreme Court addressed the issue of a pretrial continuance:
“ ‘A motion for a continuance is addressed to the discretion of the court and the court’s ruling on it will not be disturbed unless there is an abuse of discretion. Fletcher v. State, 291 Ala. 67, 277 So.2d 882 (1973). If the following principles are satisfied, a trial court should grant a motion for continuance on the ground that a witness or evidence is absent: (1) the expected evidence must be material and competent; (2) there must be a probability that the evidence will be forthcoming if the case is continued; and (3) the moving party must have exei*-cised due diligence to secure the evidence. Knowles v. Blue, 209 Ala. 27, 32, 95 So. 481, 485-86 (1923).’
“Saranthus, 501 So.2d at 1257. ‘ “There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.” Ungar v. Sarafite, 376 U.S. 575, 589, 84 S.Ct. 841, 850, 11 L.Ed.2d 921 (1964).’ Glass v. State, 557 So.2d 845, 848 (Ala.Cr.App.1990).
“ ‘The reversal of a conviction because of the refusal of the trial judge to grant a continuance requires “a positive demonstration of abuse of judicial discretion.” Clayton v. State, 45 Ala.App. 127, 129, 226 So.2d 671, 672 (1969).’ Beauregard v. State, 372 So.2d 37, 43 (Ala.Cr.App.), cert. denied, 372 So.2d 44 (Ala.1979). A ‘positive demonstration of abuse of judicial discretion’ is required even where the refusal to grant the continuance is ‘somewhat harsh’ and this Court does not ‘condone like conduct in future similar circumstances.’ Hays v. State, 518 So.2d 749, 759 (Ala.Cr.App. 1985), affirmed in part, reversed on other grounds, 518 So.2d 768 (Ala.1986), cert. denied, 485 U.S. 929, 108 S.Ct. 1099, 99 L.Ed.2d 262 (1988).”
McGlown v. State, 598 So.2d 1027, 1028-29 (Ala.Crim.App.1992).
“ ‘Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burdens counsels against continuances except for compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances.’ ”
Price v. State, 725 So.2d 1003, 1061 (Ala.Crim.App.1997), quoting Morris v. Slappy, 461 U.S. 1, 11-12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983). See also Sullivan v. State, 939 So.2d 58, 66 (Ala.Crim.App.2006) (“ ‘As a general rule, continuances are not favored,’ In re R.F., 656 So.2d 1237, 1238 (Ala.Civ.App.1995), and ‘[o]nly rarely will [an] appellate court find an abuse of discretion’ in the denial of a motion for a continuance.”).
In this case, Gobble did not inform the court of the content of the expert’s expected testimony, did not attempt to reschedule Dr. McCormick, and did not inform the court what evidence, if any, a new pathologist could present at trial. Also, the circuit court had repeatedly stressed that counsel should be ready to proceed with the trial in a timely fashion and should not ask for continuances. On one occasion he informed the attorneys that he would not be granting a last-minute continuance to obtain an expert’s testimony. Also, on cross-examination defense counsel questioned Dr. Saíne about Phoenix’s medical condition. Dr. Saíne testified that in his opinion Phoenix did not have brittle-bone disease.
*941 Based on the facts in this case we cannot say that the circuit court abused its considerable discretion in denying Gobble’s motion for a continuance to secure a second pathologist. See McGlown, supra.
III.
Gobble next argues that the circuit court erred in denying her motion to suppress statements she had made to law-enforcement personnel. She cites several grounds in support of this contention.
In reviewing a circuit court’s ruling on a motion to suppress a confession we apply the standard articulated by the Alabama Supreme Court in McLeod v. State, 718 So.2d 727 (Ala.1998):
“For a confession, or an, inculpatory statement, to be admissible, the State must prove by a preponderance of the evidence that it was voluntary. Ex parte Singleton, 465 So.2d 443, 445 (Ala.1985). The initial determination is made by the trial court. Singleton, 465 So.2d at 445. The trial court’s determination will not be disturbed unless it is contrary to the great weight of the evidence or is manifestly wrong. Marschke v. State, 450 So.2d 177 (Ala.Crim.App.1984)....
“The Fifth Amendment to the Constitution of the United States provides in pertinent part: ‘No person ... shall be compelled in any criminal case to be a witness against himself.... ’ Similarly, § 6 of the Alabama Constitution of 1901 provides that ‘in all criminal prosecutions, the accused ... shall not be compelled to give evidence against himself.’ These constitutional guarantees ensure that no involuntary confession, or other inculpatory statement, is admissible to convict the accused of a criminal offense. Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (1968).
“It has long been held that a confession, or any inculpatory statement, is involuntary if it is either coerced through force or induced through an express or implied promise of leniency. Bram v. United States, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). In Culombe, 367 U.S. at 602, 81 S.Ct. at 1879, the Supreme Court of the United States explained that for a confession to be voluntary, the defendant must have the capacity to exercise his own free will in choosing to confess. If his capacity has been impaired, that is, ‘if his will has been overborne’ by coercion or inducement, then the confession is involuntary and cannot be admitted into evidence. Id. (emphasis added).
“The Supreme Court has stated that when a court is determining whether a confession was given voluntarily it must consider the ‘totality of the circumstances.’ Boulden v. Holman, 394 U.S. 478, 480, 89 S.Ct. 1138, 1139-40, 22 L.Ed.2d 433 (1969); Greenwald v. Wisconsin, 390 U.S. 519, 521, 88 S.Ct. 1152, 1154, 20 L.Ed.2d 77 (1968); see Beecher v. Alabama, 389 U.S. 35, 38, 88 S.Ct. 189, 191, 19 L.Ed.2d 35 (1967). Alabama courts have also held that a court must consider the totality of the circumstances to determine if the defendant’s will was overborne by coercion or inducement. See Ex parte Matthews, 601 So.2d 52, 54 (Ala.) (stating that a court must analyze a confession by looking at the totality of the circumstances), cert. denied, 505 U.S. 1206, 112 S.Ct. 2996, 120 L.Ed.2d 872 (1992); Jackson v. State, 562 So.2d 1373, 1380 (Ala.Crim.App.1990) (stating that, to admit a confession, a court must determine that the defendant’s will was not overborne by pressures and circumstances swirling around him); Eakes v. State, 387 So.2d *942 855, 859 (Ala.Crim.App.1978) (stating that the true test to be employed is ‘whether the defendant’s will was overborne at the time he confessed’Xempha-sis added).”
718 So.2d at 729 (footnote omitted).
A.
First, Gobble argues that her statements were involuntary because, she says, she was intimidated and threatened by police.
Before trial, Gobble moved to suppress her statements, arguing that she did not knowingly, intelligently, and voluntarily waive her Miranda[3] rights. (C. 209.) At the suppression hearing she also argued that the statements were coerced because, she says, she was intimidated by police.
At the suppression hearing, Officer McCord testified that he interviewed Gobble twice on September 15[4] and once on September 16 after he had attended Phoenix’s autopsy. He said that all three times Gobble was read her Miranda rights from the form and that she signed a waiver-of-rights form. McCord further testified that it was his opinion that Gobble was not under the influence of any drug when she made the statements, that he did not threaten her in order to secure a statement, and that he did not offer her any reward to secure a statement.
“The test for the voluntariness of an extrajudicial confession or an inculpato-ry statement is whether, in light of all the surrounding circumstances, the statement was free from inducement, threat, or promise, either expressed or implied, that would have produced in the mind of the accused any fear of harm or hope of favor.”
Ex parte Jackson, 836 So.2d 979, 982-83 (Ala.2002).
We have reviewed the videotapes of Gobble’s statements and we find no evidence that Gobble was threatened or coerced into making the statements. Also, at the end of the last statement Gobble states that she was not threatened or coerced. Gobble’s statements were not due to be suppressed on this basis.
B.
Next, Gobble contends that the circuit court erred in failing to instruct the jury that the ultimate decision as to whether her statements were voluntary rested with the jury. She cites Bush v. State, 523 So.2d 538 (Ala.Crim.App.1988).
Initially, we note that Gobble did not request this instruction; therefore, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
In Bush, we held that “it was improper for the trial court to disclose to the jury that it had made a preliminary determination” and also to tell the jury that it could not disregard that finding. 523 So.2d at 559. In reversing the conviction, we found that the instructions “had the effect of erroneously relieving the jury of determining the voluntariness of the confessions than it otherwise would have, had it been properly charged.” 523 So.2d at 560.
However, in this case the court did not give any instruction on the voluntariness of Gobble’s statements. The Alabama Supreme Court in Ex parte Trawick, 698 So.2d 162,174 (Ala.1997), affirmed the conviction despite the trial court’s failure to sua sponte give an instruction on the vol- *943 untariness of a defendant’s confession and stated:
“Trawick next argues that the trial court erred to reversal by failing to instruct that the jury, and not the trial court, was to make the ultimate decision regarding the voluntariness of Trawick’s confession. After a pre-trial hearing on the voluntariness of the confession, the trial court ruled that it was admissible, and the confession then became central to the State’s case against Trawick. Trawick contends that, by allowing the confession into evidence over his objection, the trial court implied to the jury that the confession was voluntary and proper. Trawick concludes that the trial court was required to instruct the jury that there was still an issue of fact as to the voluntariness of the confession, and he contends that its failure to do so was reversible error.
“This Court has recognized that a trial court cannot lawfully prevent a jury from making a determination of volun-tariness as affecting the weight and credibility to be given a defendant’s statements. Ex parte Singleton, 465 So.2d 443 (Ala.1985). In Singleton, the trial judge specifically told the jury that he had already determined that the defendant’s statement was voluntary and therefore admissible; however, the judge also clearly instructed that it was the jury that was to ultimately determine whether the confession was voluntary. This Court ruled that these comments did not imply that the jury should accept or believe the defendant’s confession merely because it had been ruled admissible.
“In this case, there is even less to indicate that the trial court in any way implied to the jury that Trawick’s confession was voluntary merely because it was admissible. In admitting Trawick’s confession into evidence, the trial court did not tell the jury that it had previously ruled upon the voluntariness of Traw-ick’s confession. The trial court properly instructed the jury that the court would rule only as to whether evidence could be admitted into the case and that the jury would be the sole and exclusive judge of the truth of the evidence that was admitted. The trial court specifically stated that it did not get involved in the jury’s ‘job’ as the finder of fact. We find no plain error in the trial court’s instruction.”
698 So.2d at 174. See also Woods v. State, 789 So.2d 896 (Ala.Crim.App.1999); Minor v. State, 780 So.2d 707 (Ala.Crim.App.1999).
We find no plain error in the circuit court’s failure to sua sponte give an instruction concerning the ultimate decision on the voluntariness of Gobble’s statements to police. See Trawick, supra.
C.
Third, Gobble argues that the State improperly commented on her Fifth Amendment right against self-incrimination. Specifically, Gobble asserts that the circuit court exposed the jury to comments about her right to remain silent when it admitted her third statement to police. She relies on of Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), and Doyle v. Ohio, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976).
During questioning, Officer McCord told Gobble: “This is your last opportunity. And if you ... if you get the ... if it happens to go in front of [sic] jury and you haven’t spoken or haven’t said anything o.k. ... then they’re gonna be left to make their own assumption as to *944 what happened, o.k.?” (Supp. R. 222.)[5] Sometime later during the same interview, Officer McCord said: “Because your attorney more than likely ... I can’t tell ya what ... exactly what an attorney will do ... more’n likely he’s ain’t gonna let you get on a stand and testify.” (Supp. R. 281.)
There was a lengthy discussion concerning this issue at trial. The prosecutor attempted to introduce a transcript of the statement that contained this reference, the third statement, that his office had prepared. That transcript redacted the now challenged comments. However, when the State began to read the transcript into evidence, Gobble objected and argued that the transcript was not the same as the videotaped statement. Gobble then argued that the entire statement should be suppressed. Defense counsel compared the video and the transcript and agreed that the transcript was the same as the videotape. The circuit court gave Gobble the option of either having the redacted transcript read into evidence or having the videotape of the statement played to the jury. The following occurred:
“[Defense counsel]: The new transcript was acceptable with respect to the transcription, Your Honor. But we have to object to using that in the manner that the State has been using it, because there is such a gross difference between the emotionally charged interrogation and what [the prosecutors] are doing here in the courtroom. What the jury has to evaluate is both Ms. Gobble’s responses and how she got there.
“There was a lot of yelling, a lot of intimidation, a lot of bearing down on the video in the last part of the interrogation. And that to us is crucial.
“The Court: So now you want it played. Yesterday, you didn’t. But now you do? “[Defense counsel]: Yes, sir.
“[The Court]: All right. What is the response from the State?
“[Prosecutor]: Judge, once again, Your Honor, we’re back to the same point they want it played. I have no objection, except here’s the problem, it’s the State’s contention they are just trying to get error in. Because the first time— and it’s going to come out, Judge, when you play the tape, I’d like to use an example on page twelve, Investigator McCord says, ‘[Bjecause your attorney more than likely — I can’t tell you what— exactly what an attorney will do — but *945 more than likely isn’t going to let you get on the stand and testify, because he don’t want you on the stand to testify, okay.’ That is clearly not admissible. And that will be reversed, if that is allowed to be played. So they are inviting error.
[[Image here]]
“[Defense counsel]: Judge, the error is already in. The error occurred when the investigator intimidated and threatened and harassed her throughout the statement. Once he does that — that lasts throughout the whole statement.
“The Court: Okay. I understand. And I am ready to rule, okay. We either show the whole tape as it is, or we put the transcriptions in with the redactions that don’t help your client one way or the other. You’ve got your choice.
[[Image here]]
“[Defense counsel]: Judge, I am going to leave that up to the Court. Our position is we object to any further showing of the videotape or statements. And we ask the Court to reconsider granting our motion to suppress the statements and instruct the jury to disregard it.
“[Prosecutor]: The tapes themselves show she says she wasn’t coerced or threatened. She says that—
“The Court: All right. We will play the whole tape.”
(R. 377-81.)
If error occurred it was invited by defense counsel. Invited error applies to death-penalty cases and operates to waive the error unless “it rises to the level of plain error.” Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991). Defense counsel viewed the entire contents of the videotape as supporting his proposition that his client had been pressured by police to talk about the events leading to her son’s death.
Also, Doyle has no application because Gobble did not remain silent but chose to speak with police.
“The Fifth Amendment provides, in relevant part, that ‘[n]o person ... shall be compelled in any criminal case to be a witness against himself[.]’ U.S. Const, amend. V. This provision applies to the states via the Due Process Clause of the Fourteenth Amendment. Malloy v. Hogan, 378 U.S. 1, 6, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964). The Supreme Court has determined that this provision ‘forbids either comment by the prosecution on the accused’s silence or instructions by the court that such silence is evidence of guilt.’ Griffin v. California, 380 U.S. 609, 615, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965). Likewise, ‘it would be fundamentally unfair and a deprivation of due process to allow the arrested person’s silence to be used to impeach an explanation subsequently offered at trial.’ Doyle v. Ohio, 426 U.S. 610, 618, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976). Nevertheless, Doyle does not apply where the accused actually speaks with the police. ‘Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving Miranda warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.’ Anderson v. Charles, 447 U.S. 404, 408, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980).”
Woodard v. McKee, (No. 06-12219, April 13, 2009) (E.D.Mich.2009) (not reported in F. Supp.).
We cannot say that Gobble’s substantial rights were adversely affected. See Rule 45A, Ala.R.App.P. Therefore, we find no plain error in regard to this claim.
*946 D.
Gobble next contends that the circuit court erred in allowing the State to use typed transcriptions of the videotaped statements, which, she argues, were not entirely accurate.
As stated above, the record shows that transcripts of all three statements were compiled by the sheriffs department. The district attorney’s office also made a transcript of the third statement. Transcripts of the first two statements were introduced, but only a portion of the transcript of the third statement was read into evidence. At the suppression hearing, Officer McCord testified that he was present for all three of Gobble’s statements and that the transcripts that had been prepared were accurate. We have reviewed the videotapes and the transcripts of the statements and we likewise conclude that they are accurate. The court also instructed the jury to rely on the videotapes and not the transcripts of the statements.
“The fact that a recording is partially inaudible in those portions likely to contain material statements does not require its exclusion from evidence unless the recording is the only evidence offered as to the statements.’ Austin v. State, 354 So.2d 40, 43 (Ala.Cr.App.1977), 354 So.2d 4[4] (Ala.1978). See also Boulden v. State, 278 Ala. 437, 179 So.2d 20, 33 (1965) (no reversible error in admitting transcriptions of tape recordings, where the trial judge played the tapes outside the presence of the jury and decided that they were sufficiently audible to be played and, further, that the appellant could not have been hurt by the playing of the tapes in light of the testimony of the officer to whom he confessed.).”
Hill v. State, 516 So.2d 876, 878 (Ala.Crim.App.1987). “Moreover, the appellant’s argument that the transcription was not a verbatim reproduction of a partially audible tape does not address the admissibility of the transcription, but rather the weight it would be given by the jury.” Clark v. State, 562 So.2d 620, 624 (Ala.Crim.App.1989).
“ ‘Where the tape-recorded statement or conversation is missing or unavailable, “[a] typewritten transcript of [the recording] is admissible where the officer who listened to the conversation at the time of the recording testifies that the transcript accurately reflectfs] the conversation.” Hawkins [v. State ], 443 So.2d [1312,] 1314-15 [(Ala.Crim.App.1983) ]. We have also permitted the admission of a transcript where the tape recording was inaudible in places. Thornton v. State, 570 So.2d 762 (Ala.Cr.App.1990); Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987); Dawkins v. State, 455 So.2d 220 (Ala.Cr.App.1984).
“ ‘Although the tape recording in the present case was neither unavailable nor inaudible, we see no reason why a different rule should apply. Lieutenant Sco-gin was in a position to establish the reliability and accuracy of the transcript, see Gwin v. State, 425 So.2d 500, 505 (Ala.Cr.App.1982), cert. quashed, 425 So.2d 510 (Ala.1983), and did so. Furthermore, the transcript was merely cumulative evidence, the admission of which rests within the discretion of the trial court. White v. State, 587 So.2d 1218, 1228 (Ala.Cr.App.1990), affirmed, 587 So.2d 1236 (Ala.1991); Gainer v. State, 553 So.2d 673, 684 (Ala.Cr.App.1989). Consequently, the transcript was properly admitted for the limited purposes advanced by the prosecution.’ ”
Battle v. State, 645 So.2d 344, 346-47 (Ala.Crim.App.1994), quoting Jackson v. State, 594 So.2d 1289, 1297 (Ala.Crim.App.1991) (footnote omitted).
*947 The circuit court committed no error in allowing the use of transcripts of Gobble’s statements to aid the jury. See Battle, supra.
E.
Last, Gobble argues that the State violated the circuit court’s discovery order by not timely disclosing the transcript of the third statement that had been prepared by the district attorney’s office. Gobble never objected on this ground at trial; therefore, we review this claim for plain error. See Rule 45A, Ala.R.App.P. Only a portion of the transcript of the third statement was read to the jury. Also, Gobble was given access to the videotape of the statement. To establish reversible error for a discovery violation “the accused must show prejudice.” Smith v. State, 698 So.2d 189, 207 (Ala.Crim.App.1996). See also Morrison v. State, 601 So.2d 165 (Ala.Crim.App.1992). Gobble can show no prejudice in regard to this claim; thus, there is no plain error.
In conclusion, we hold that the circuit court correctly allowed Gobble’s three statements to be received into evidence.
IV.
Gobble next argues that the prosecutor improperly used voir dire as an opportunity to argue its case. Specifically, she asserts that the prosecutor exceeded the scope of proper voir dire and violated Rule 18.4(d), Ala.R.Crim.P.
Gobble made no objection to the court’s method of handling the voir dire examination of the prospective jurors; thus, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
The record shows that the circuit court allowed the prosecutor to question the prospective jurors about information that would be admitted during trial.
Rule 18.4(d), Ala.R.Crim.P„ provides: “Voir dire examination of prospective jurors shall be limited to inquiries directed to basis for challenge for cause or for obtaining information enabling the parties to knowledgeably exercise their strikes.”
“ ‘In selecting a jury for a particular case, “the nature, variety, and extent of the questions that should be asked prospective jurors” must be left largely within the sound discretion of the trial court. Peoples v. State, 375 So.2d 561 (Ala.Crim.App.1979). In other words, the scope of the voir dire examination of the jury venire is within the broad discretion of the trial court. Bowens v. State, 54 Ala.App. 491, 309 So.2d 844 (1974), cert. denied, 293 Ala. 746, 309 So.2d 850 (1975); Witherspoon v. State, 356 So.2d 743 (Ala.Crim.App.1978); Ervin v. State, 399 So.2d 894 (Ala.Crim.App.), cert. denied, 399 So.2d 899 (Ala.1981).’ ”
Hall v. State, 820 So.2d 113,124 (Ala.Crim.App.1999), quoting Bracewell v. State, 447 So.2d 815, 821 (Ala.Crim.App.1983). “It is well settled that the process of voir dire examination remains within the sound discretion of the trial court.” State v. Watts, 35 So.3d 1, 5 (Ala.Crim.App.2009).
There is no indication that the circuit court abused its discretion in its method of handling the voir dire examination of the prospective jurors.
V.
Gobble next argues that the prosecutor violated Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), by using its peremptory strikes to remove black prospective jurors and male prospective jurors from Gobble’s jury.
*948 In Batson, the United States Supreme Court held that it was violation of the Equal Protection Clause to strike a black prospective juror from a black defendant’s jury based solely on the juror’s race. This holding was extended to gender-based strikes in J.E.B.
The record shows that not only did Gobble not object but that the following occurred:
“The Court: Do you have any other motions before we sit the jury?
“[Defense counsel]: No, sir. We don’t have a Batson.”
(R. 210.) In Calhoun v. State, 932 So.2d 923 (Ala.Crim.App.2005), we held that counsel could waive a Batson objection. Because Gobble did not make a Batson motion, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
As the Alabama Supreme Court stated in Ex parte Trawick, 698 So.2d 162 (Ala.1997):
“A party making a Batson or J.E.B. challenge bears the burden of proving a prima facie case of discrimination and, in the absence of such proof, the prosecution is not required to state its reasons for its peremptory challenges. Ex parte Branch, 526 So.2d 609 (Ala.1987); Ex parte Bird, 594 So.2d 676 (Ala.1991). In Branch, this Court discussed a number of relevant factors a defendant could submit in attempting to establish a pri-ma facie case of racial discrimination; those factors are likewise applicable in the case of a defendant seeking to establish gender discrimination in the jury selection process. Those factors, stated in a manner applicable to gender discrimination, are as follows: (1) evidence that the jurors in question shared only the characteristic of gender and were in all other respects as heterogenous as the community as a whole; (2) a pattern of strikes against jurors of one gender on the particular venire; (3) the past conduct of the state’s attorney in using peremptory challenges to strike members of one gender; (4) the type and manner of the state’s questions and statements during voir dire; (5) the type and manner of questions directed to the challenged juror, including a lack of questions; (6) disparate treatment of members of the jury venire who had the same characteristics or who answered a question in the same manner or in a similar manner; and (7) separate examination of members of the venire. Additionally, the court may consider whether the State used all or most of its strikes against members of one gender.”
698 So.2d at 167-68. “ ‘To find plain error in the context of a Batson or J.E.B. violation, the record must supply an inference that the prosecutor was ‘engaged in the practice of purposeful discrimination.’ Ex parte Watkins, 509 So.2d 1074, 1076 (Ala.1987).” Blackmon v. State, 7 So.3d 397, 425 (Ala.Crim.App.2005) (opinion on application for rehearing).
Here, the supplemental record contains the venire list, which details the prospective jurors’ demographic information. Although the strike list is also contained in the record, the juror identification numbers on the strike list do not match the juror identification numbers on the venire list. A second strike list is contained in the record that lists the numbers and names of the jurors whom the State struck for cause. However, when, during the voir dire examination, a juror would respond to a question, the record, on numerous occasions, fails to identify the juror speaking but merely states “prospective juror.”
The State did strike five prospective black jurors. The record shows *949 that prospective juror E.C.,[6] a black female, indicated twice during questioning that she was not prepared to serve on a capital murder jury. “The peremptory strike of a prospective juror who had expressed reservations about the death penalty was sufficiently race-neutral so as to not violate Batson.” Acklin v. State, 790 So.2d 975, 988 (Ala.Crim.App.2000). Juror M.B., a black female, indicated that her nephew had been in trouble with the law and had served time in jail, that she had been robbed at gun point, and that her son had also been in trouble with the law. “Striking a prospective juror because a member of the juror’s family has been convicted of a crime is a valid race-neutral reason under Batson.” Lewis v. State, 741 So.2d 452, 456 (Ala.Crim.App.1999). Juror K.D., a black female, responded that she did not wish to serve because her cousin had a capital-murder charge pending against him. A juror’s indication that he or she does not wish to serve is a valid race-neutral reason. See Council v. State, 682 So.2d 495 (Ala.Crim.App.1996). However, because of the failure of the record to consistently identify the jurors it is not as apparent why the State struck the other two black males.[7] The record does show that white and black prospective jurors were not subjected to disparate treatment during voir dire questioning. Nor is there evidence of disparate treatment of jurors who shared similar characteristics. “Numbers alone are not sufficient to establish a prima facie case of discrimination.” Blackmon v. State, 7 So.3d 397 (Ala.Crim.App.2005). We cannot say that the record establishes a prima facie case of a Batson violation.
Moreover, the record does not reflect a prima facie case of gender discrimination. The record shows that the state struck five women and seven men[8] and that Gobble’s jury was composed of seven males and five females. Gobble asserts that the juror’s occupations show discrimination. However, the record does not contain any indication as to occupations of the jurors. There is nothing to establish a prima facie case of gender discrimination. Accordingly, we find no plain error. See Ex parte Watkins, supra.
VI.
Gobble next argues that the circuit court erred in refusing to dismiss juror F.B. after it was disclosed that F.B. had contact with Officer McCord. Specifically, Gobble contends that her due-process rights were violated by the unauthorized contact. She cites Turner v. Louisiana, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965), and Ex parte Pierce, 851 So.2d 606 (Ala.2000), to support her contention that the unauthorized contact entitles her to a new trial.
The record shows that during a recess the prosecutor informed the court that he had seen F.B. talking to Officer McCord in the hallway of the courthouse. The circuit *950 court then inquired into the substance of their conversation. F.B. told the court that they had talked about nothing related to the case but that he had told Officer McCord that he needed a haircut and Officer McCord had responded that he worked in the drug unit. The circuit court instructed F.B. not to talk to Officer McCord. The following then occurred:
“[Defense counsel]: Okay. The fact that you have carried on a conversation, apparently, /all seem to like each other a little bit on a friendly basis, would that — what effect, if any, would that have on your weighing his testimony?
“[F.B.]: None, sir.
“[Defense counsel]: Okay. You are sure? This is a capital murder case—
“[F.B.]: I understand sir. No, sir. No, sir. No, sir.
“[Defense counsel]: You understand it is a capital murder case?
“[F.B.]: I understand what it is, sir.
“[Defense counsel]: Okay. And you are not going to give his testimony, Mr. McCord’s testimony, any greater weight than if you had not conversed with him?
“[F.B.]: No, sir. what he says or what he did, I didn’t fall off a turnip truck yesterday.”
(R. 372-73.) At the time this encounter was brought to the court’s attention Gobble did not request that F.B. be removed and replaced with one of the alternates, nor did she object to the circuit court’s handling of the matter. Only when the circuit court was about to release the alternates did Gobble move that F.B. be removed and replaced with an alternate. At this late point in the trial the circuit court denied the motion. (R. 823.)
In Minor v. State, 914 So.2d 372 (Ala.Crim.App.2004), this Court considered a similar issue and stated:
“In both Turner [v. Louisiana, 379 U.S. 466 (1966),] and Ex parte Pierce, [851 So.2d 606 (Ala.2000),] the jurors had close and continual contact with key prosecution witnesses throughout the trial; specifically, the law-enforcement officers who were in charge of taking care of the jury, who transported the jurors to and from their lodging each day, who ate meals with the jurors, and who conversed with the jurors on a regular basis throughout the trial, were key prosecution witnesses in both Turner and Ex parte Pierce. Based on this situation, the United States Supreme Court held in Turner, and the Alabama Supreme Court held in Ex parte Pierce, that the defendant’s due-process right to a fair trial by an impartial jury was violated and that prejudice could be presumed from such close and continual contact even if there was no evidence to show that the law-enforcement officers had discussed the facts of the case with the jurors. Specifically, the Court in Turner stated that ‘it would be blinking reality not to recognize the extreme prejudice inherent in this continual association throughout the trial between the jurors and these two key witnesses for the prosecution.’ 379 U.S. at 473, 85 S.Ct. 546.”
914 So.2d at 412-13.
In both Turner and Pierce, prejudice was presumed because of the close and continual contact between the key witness and a juror. Pierce, 851 So.2d at 610. However, in this case the contact was not close and continual. “[Pjrejudice cannot be presumed under the facts in this case as it was in Turner and Ex parte Pierce; rather, as this Court held in Myers v. State, 677 So.2d 807, 810 (Ala.Crim.App.1995), ‘[i]n order to be entitled to [relief] due to contact by a juror with witnesses or *951 others, prejudice must be shown.’” Minor, 914 So.2d at 413.
“In order to show prejudice in a case such as this one involving misconduct by a non-juror in speaking to a juror, a defendant must establish only that the verdict might have been affected by the juror’s outside contact with the other person. See Roan v. State, 225 Ala. 428, 435, 143 So. 454, 460 (1932) (‘The test of vitiating influence is not that it did influence a member of the jury to act without the evidence, but that it might have unlawfully influenced that juror and others with whom he deliberated, and might have unlawfully influenced its verdict rendered.’). See also Ex parte Dobyne, 805 So.2d 763, 771 (Ala.2001) (citing Roan in the context of juror misconduct, specifically the failure of a juror to properly respond to questions on voir dire). However, this might-have-influenced-the-verdict standard nevertheless requires more than a mere showing that the juror was exposed to outside influences. See Ex parte Apicella, 809 So.2d 865 (Ala.2001). In Ex parte Apicella, the Alabama Supreme Court, addressing a juror-misconduct claim (a juror spoke with an attorney not associated with the case), explained the standard as follows:
“ ‘On its face, this standard would require nothing more than that the defendant establish that juror misconduct occurred. As Apicella argues, the word “might” encompasses the entire realm of possibility and the court cannot rule out all possible scenarios in which the jury’s verdict might have been affected.
“ ‘However, as other Alabama eases establish, more is required of the defendant. In Reed v. State, 547 So.2d 596, 598 (Ala.1989), this Court addressed a similar case of juror misconduct:
“ ‘ “We begin by noting that no single fact or circumstance will determine whether the verdict rendered in a given case might have been unlawfully influenced by a juror’s [misconduct]. Rather, it is a case’s own peculiar set of circumstances that will decide the issue. In this case, it is undisputed that the juror told none of the other members of the jury of her experiment until after the verdict had been reached. While the question of whether she might have been unlawfully influenced by the experiment still remains, the juror testified at the post-trial hearing on the defendant’s motion for a new trial that her vote had not been affected by the [misconduct].’
“ ‘It is clear, then, that the question whether the jury’s decision might have been affected is answered not by a bare showing of juror misconduct, but rather by an examination of the circumstances particular to the case. In this case, as in Reed, the effect of the misconduct was confined to the juror who committed the misconduct. The Reed Court stated:
“ ‘ “We cannot agree with the defendant that the verdict rendered might have been unlawfully influenced, where the results of the [misconduct] were known only to the one juror who [committed the misconduct] and that juror remained unaffected by the [misconduct].”
“ ‘547 So.2d at 598. Because no evidence indicates that [the juror] shared the content of his conversation with the other members of the jury and because no- evidence indicates that *952 [the juror’s] own vote was affected, we cannot say the trial court abused its discretion in finding no actual prejudice.’ ”
Minor, 914 So.2d at 413-14, quoting in part, Ex parte Apicella, 809 So.2d 865, 871 (Ala.2001).
There is no indication that “the jury’s decision might have been affected,” by F.B.’s limited contact with Officer McCord. Accordingly, we find no reversible error. See Minor, supra.
VII.
Gobble next argues that the circuit court erred in allowing what she described as inadmissible character evidence to be admitted in the guilt phase of her trial because, she asserts, the evidence was not relevant and was unfairly prejudicial.
Rule 401, Ala.R.Evid., defines “relevant evidence” as “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” Rule 402, Ala.R.Evid., further provides that “[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States or that of the State of Alabama, by statute, by these rules, or by other rules applicable in the courts of this State.”
“ ‘Alabama recognizes a liberal test of relevancy, which states that evidence is admissible “if it has any tendency to lead in logic to make the existence of the fact for which it is offered more or less probable than it would be without the evidence.” ’ Hayes [v. State, 717 So.2d [30] at 36 [ (Ala.Crim.App.1997) ], quoting C. Gamble, Gamble’s Alabama Evidence § 401(b). ‘[A] fact is admissible against a relevancy challenge if it has any probative value, however[ ] slight, upon a matter in the case.’ Knotts v. State, 686 So.2d 431, 468 (Ala.Crim.App.1995), aff'd, 686 So.2d 486 (Ala.1996). Relevant evidence should be excluded only ‘if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.’ ”
Gavin v. State, 891 So.2d 907, 963-64 (Ala.Crim.App.2003).
A.
First, Gobble asserts that evidence that she dressed in black clothing, dyed her hair black, and referred to herself as “Fallen Angel,” was not admissible for any purpose because it was irrelevant. Gobble also asserts that evidence that her boyfriend, Samuel Hunter, after he started dating Gobble, began dressing in black and dyed his hair black was likewise irrelevant.
The State argues in its brief to this Court that this evidence was admissible to show that Gobble was the dominant person in her relationship with Hunter. Gobble testified that she was afraid of Hunter, that he was abusive, and that he was the dominant person in the relationship. Gobble’s father and stepmother also testified that Hunter was the dominant partner in his relationship with Gobble. This testimony was relevant and was correctly received into evidence. See Gavin.
B.
Second, Gobble argues that the circuit court erred in allowing the State to introduce evidence that she had been involved with a individual named Wolf who referred to himself as a vampire. We note that Gobble presented some of this evidence in documents admitted as defense exhibits. Also, the State argues in its *953 brief to this Court that Gobble testified that she was a loving mother who would not abandon her children and that she chose to live with Hunter because she loved him and that information that she had been involved with another man and not living with her children was relevant to rebut that testimony.
“As the United States Supreme Court stated in Davis v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 89 L.Ed.2d 347 (1974):
“ ‘Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness’ story to test the witness’ perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.’
“415 U.S. at 316, 94 S.Ct. 1105. ‘ “The latitude and extent of cross-examination, of necessity, is a matter within the sound discretion of the trial court, and, in the absence of prejudicial abuse, it is not reviewable on appeal.” Turney v. State, 289 Ala. 97, 100, 265 So.2d 883 (1972).’ Ashurst v. State, 462 So.2d 999, 1008-09 (Ala.Crim.App.1984).”
Marshall v. State, 20 So.3d 830, 835 (Ala.Crim.App.2008). “Where a witness’ testimony is of major importance and is strongly adverse to the party against whom he has testified, the usual discretion of a trial court has a narrow range, and it generally is required to allow proof of any important fact indicating bias of the witness.” Proctor v. State, 331 So.2d 828, 830 (Ala.Crim.App.1976).
“In the discharge of its fact finding functions the jury’s search for the truth includes the paramount right to consider a witness’s motivation, and any evidence testing ‘his interest, bias or prejudice’ so as to ‘illustrate or impeach the accuracy of his testimony1 is a competent, material and relevant subject of cross-examination, and the jury’s right to be given such evidence is, of itself, part of the fact finding process. Green v. State, [258 Ala. 471, 64 So.2d 84 (1953) ].”
Ex parte Brooks, 393 So.2d 486, 487-88 (Ala.1980).
“ ‘[Wjhen the accused takes the stand to testify in his own behalf, he does so in a dual capacity — (1) as the accused and (2) as a witness. In his capacity as a witness his credibility may be impeached in the same way or ways in which the credibility of any other witness may be impeached. Stone v. State, 208 Ala. 50, 93 So. 706 [ (1922) ]; Pitts v. State, 261 Ala. 314, 74 So.2d 232 [(1954)]. “A defendant, who testifies for himself as a witness, may be impeached in the same manner as other witnesses, by showing that he has been convicted of a crime involving moral turpitude, or that he has made contradictory statements, or that he is a person of bad character.” ’ ”
Fisher v. State, 57 Ala.App. 310, 328 So.2d 311, 317 (Ala.Crim.App.1976), quoting Chambers v. State, 264 Ala. 8, 10, 84 So.2d 342, 343-44 (1955).
Rule 611(b), Ala.R.Evid., states: “The right to cross-examine a witness extends to any matter relevant to any issue and to matters affecting the credibility of the witness.” In discussing the scope of Rule 611(b), Ala.R.Evid., Professor Gamble writes:
“Rule 611 means that cross-examination generally is not limited in scope to the matters brought out on the witness’ direct examination. Rather, the cross-examiner may ask two kinds of questions that fall within the permissible boundaries of cross-examination. First, *954 any question relevant to the witness’s credibility may be propounded. Additionally, any question is permissible so long as it is relevant to a material matter in the case. Even if a question is not otherwise relevant to a material issue in th case, the cross-examiner may be permitted to propound it if the question is relevant to a matter brought out by the adverse party during direct examination of the witness.”
C. Gamble, McElroy’s Alabama Evidence, § 136.01 (5th ed. 1996).
The circuit court did not abuse its discretion in allowing the prosecutor the leeway to thoroughly cross-examine Gobble.
C.
Third, Gobble asserts that it was error to allow the State to present evidence concerning her lack of parenting skills and evidence indicating that she did not volunteer to pay for Phoenix’s funeral.
Gobble testified on direct examination that abandonment charges had been filed on her by the Florida DCF. Certainly, Gobble’s parenting skills and her disregard for her son were critical to the issue of her guilt in this case and were within the proper scope of cross-examination. See Rule 611(b), Ala.R.Evid.
D.
Next, Gobble argues that it was error to allow the State to present evidence of her marijuana use. There was no objection when this testimony was admitted; therefore, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
Gobble testified on direct examination that she did not “do drugs.” (R. 635.) On cross-examination the following occurred:
“[Prosecutor]: You told [defense counsel on direct] that you had never used marijuana. Is that what you said?
“[Gobble]: No. He asked me was I using drugs. And I said, no.
“[Prosecutor]: You have used marijuana; correct?
“[Gobble]: Yes, sir, I have tried it.”
(R. 724.) The prosecutor’s questions were within the proper scope of cross-examination and were admissible to impeach Gobble’s credibility. See Rule 611(b), Ala. R.Evid.
Gobble also argues in this section of her brief to this Court that the circuit court failed to sua sponte give a limiting instruction on the use of the testimony that Gobble had tried marijuana. She relies on Ex parte Minor, 780 So.2d 796 (Ala.2000). Because Gobble did not request such as instruction, we review this claim for plain error. See Rule 45A, Ala. RApp.P.
“In Ex parte Minor, 780 So.2d 796 (Ala.2000), the Alabama Supreme Court held that it was plain error where the trial court failed to sua sponte instruct the jury that evidence of the defendant’s prior convictions introduced for impeachment purposes could not be considered as substantive evidence of the defendant’s guilt of the crime for which he was now on trial. See also Snyder v. State, 893 So.2d 482 (Ala.2001). However, the holdings in Minor and Snyder have been repeatedly held to apply only to those cases in which the defendant testified and the evidence of prior convictions was admitted for impeachment purposes, and then on a case-by-case basis. See, e.g., Johnson v. State, [Ms. 1041313, Oct. 6, 2006] — So.[3]d-(Ala.2006); Ex parte Martin, 931 So.2d 759 (Ala.2004); Key v. State, 891 So.2d 353 (Ala.Crim.App.2002).”
Floyd v. State, [Ms. CR-05-0935, September 28, 2007] - So.3d -, - (Ala.Crim.App.2007).
*955 No evidence was introduced indicating that Gobble had any prior convictions. Only a brief reference that Gobble had “tried marijuana” was made. Also, no undue emphasis was placed on this evidence. Further, the prior misconduct was not similar to the conduct underlying the charge on which she was being tried. Accordingly, we find no plain error in the circuit court’s failure to give sua sponte a limiting instruction on the use of this evidence.
VIII.
Gobble next argues that the circuit court erred in not allowing her to call Edgar Parrish and Samuel David Hunter in her defense. Gobble cites Mosley v. State, 652 So.2d 767 (Ala.Crim.App.1994), in support of her assertion that the circuit court committed reversible error in not allowing her to call these witnesses.
In Mosley, this Court held that it was reversible error to allow a codefendant to invoke his Fifth Amendment right not to testify without the codefendant’s first taking the witness stand in the presence of the jury.
However, in Biles v. State, 715 So.2d 878 (Ala.Crim.App.1997), we limited our holding in Mosley and stated:
“The Fifth Amendment privilege against self-incrimination may be invoked by a witness after only the witness has been sworn and asked a question that would elicit incriminating evidence if answered. J.D.S. v. State, 587 So.2d 1249 (Ala.Cr.App.1991). Thus, in this case, the trial court improperly permitted Ms. Biles to ‘take the Fifth’ without taking the stand and without having been asked a single question. However, the appellant failed to set out the questions that he intended to ask Ms. Biles and failed to make an offer of proof as to what he expected her testimony to prove.
Thus, we find the language in Gwin v. State, 425 So.2d 500, 509 (Ala.Cr.App.1982), cert. quashed, 425 So.2d 510 (Ala.1983), to be dispositive:
“ ‘Error cannot be predicated upon the trial court’s refusal to compel the witness to testify unless the defendant made an offer of proof showing that the testimony he expected to elicit from the witness would not have been incriminating. Compare Murphy v. State, 108 Ala. 10, 18 So. 557 (1895); Patterson v. State, 37 Ala.App. 161, 66 So.2d 191, cert. denied, 259 Ala. 152, 66 So.2d 194 (1953). Since the witness only could have been required to answer any question which did not tend to incriminate him, but not others, the defendant should have made an offer of proof. To put the trial court in error in declining to allow a question to be answered, it must have been suggested what it was proposed to prove, and how it would be relevant and competent, unless the question in itself gave such information.’ ”
715 So.2d at 888.
Here, the record shows that before trial Gobble informed the circuit court that she intended to call her codefendants — Parrish and Hunter — to testify. Parrish’s attorney moved to quash Parrish’s subpoena on Fifth Amendment grounds, and the State moved to quash both subpoenas. It does not appear the circuit court ever ruled on the motion to quash. However, during the defense’s presentation of its case Gobble moved to have Parrish and Hunter take the witness stand. The following occurred:
“The Court: Okay. [Defense counsel], the two attorneys [for the codefendants] have already informed me ... that they will not allow their clients to take the *956 stand. So the motion is denied. Have you talked to these folks?
“[Defense counsel]: Talked with who? The lawyers? The codefendants?
“The Court: Yeah.
“[Defense counsel]: No. But I think I can put them on the stand. An then on the record if they want to invoke the Fifth Amendment, they have to invoke the Fifth' Amendment.
“The Court: Well, their attorneys have already informed me that they are not going to testify.
[[Image here]]
“[Prosecutor]: Judge, they cannot call a witness who invokes the Fifth Amendment. The only purpose, Judge is— here’s what they don’t tell you what they want to do, [defense counsel] wants to argue—
“The Court: Oh, I know what they want to do.”
(C. 753-54.) Counsel made no offer of proof as to Parrish and Hunter’s expected testimony. In fact, counsel stated that he had not even spoken to Parrish or Hunter.
The circumstances of this case are more analogous to those presented to this Court in Garner v. State, 606 So.2d 177 (Ala.Crim.App.1992). In Gamer, we addressed whether it was error for the circuit court to not allow a codefendant to testify when the court knew the codefen-dant was going to invoke his Fifth Amendment right. In upholding the circuit court’s ruling excluding the codefendant’s testimony, we stated:
“Here, the appellant was not deprived of any witness on his behalf because this witness was going to assert his Fifth Amendment right against self-incrimination, and defense counsel knew this. ‘The trial court may, ex mero motu, exclude improper evidence at any stage of the trial.’ Chillous v. State, 405 So.2d 58, 62 (Ala.Cr.App.1981).
“Furthermore, as stated by this court in Hurst v. State, 397 So.2d 203 (Ala.Cr.App.1981), cert. denied, Ex parte Hurst, 397 So.2d 208 (Ala.1981):
“ ‘It is the court’s duty to confine the evidence to the points in issue in order that the attention of the jury may not be distracted, or that their minds may not be withdrawn from the main issue and directed to matters which are foreign or of questionable or doubtful relevancy. Gulley v. State, 342 So.2d 1362, 1365 (Ala.Cr.App.1977).’
“Hurst, 397 So.2d at 207.
“The tactic of defense counsel was to in effect have the jury draw an inference of guilt from Alexander’s exercise of the right against self-incrimination. Alexander’s testimony was properly excluded in that it ‘would have had no bearing on the case’ nor would it have ‘enlightened the jury as to any material aspect in the case.’ Hurst, 397 So.2d at 207. The trial court’s exclusion of this witness’s testimony was, therefore, proper.
“Moreover, this court in Thomas v. State, 473 So.2d 627 (Ala.Cr.App.1985), stated the general rule when the prosecution calls an accomplice or another witness to testify for the State, knowing the witness will invoke the Fifth Amendment.
“ ‘ “It is error for the prosecution to call an accomplice or another witness to testify for the state if he knows the witness will invoke the Fifth Amendment.” N. Chiarkas, Alabama Criminal Trial Practice 219 (1981). See Busby v. State, 412 So.2d 837 (Ala.Cr.App.1982); Shockley v. State, 335 So.2d 659 (Ala.Cr.App.1975), affirmed, 335 So.2d 663 (Ala.1976); Allison v. *957 State, 331 So.2d 748 (Ala.Cr.App.), cert. denied, 331 So.2d 751 (Ala.1976).
“ ‘The general rule is stated in An-not., 19 A.L.R.4th 368, 373 (1983):
“‘“[I]t is improper for the prosecution to call as a witness one whom it knows will certainly invoke the privilege against testifying on the ground of self-incrimination, with the sole purpose or design of having the jury observe that invocation. Obviously, it is difficult to demonstrate that the prosecution had this sole purpose or design, and it would be necessary, in any event, to demonstrate prejudice to the accused in order to effect the reversal of a conviction.” ’
“Thomas, 473 So.2d 627, 629-30.
“In Thomas, this court held that the defendant’s right to a fair trial was not prejudiced after the State called the convicted codefendant as a rebuttal witness to testify against the defendant when there was no evidence that the State called the co-defendant with the purpose of having the jury observe him invoke his right against self-incrimination. Furthermore, the State presented a strong case against the defendant, and the co-defendant was not extensively examined after the invocation of his right.
“In the instant case the trial judge properly excluded Alexander’s testimony when the trial judge knew defense counsel’s purpose was to have the jury observe Alexander invoke his right against self-incrimination.”
606 So.2d at 181-82. See also Sanford v. State, 652 So.2d 776 (Ala.Crim.App.1994) (“[I]t was improper for defense counsel, knowing [the accomplice] planned to invoke the Fifth Amendment, to call him as a witness and question him in an apparent attempt to have the jury to draw an inference of his guilt from his assertion of rights.”); Robinson v. State, 728 So.2d 650, 655 (Ala.Crim.App.1997) (“[I]t was improper for defense counsel to call [the accomplice] as a witness, knowing that [the accomplice] planned to invoke the Fifth Amendment. This was an apparent attempt to have the jury infer [the accomplice’s] guilt from his assertion of rights.”).
For the foregoing reasons, we find no error in the circuit court’s ruling. As the court intimated, counsel’s purpose for calling Parrish and Hunter was clearly for the jury to see them invoke their Fifth Amendment right to remain silent. Under these circumstances, we hold that the circuit court committed no reversible error in excluding Parrish’s and Hunter’s testimony. See Gamer, supra.
IX.
Gobble next argues that the circuit court erred in allowing the admission of what she characterizes as inadmissible hearsay evidence. She makes several different arguments in this regard.
“Hearsay” is defined in Rule 801(c), Ala. R.Evid., as “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.”
A.
First, Gobble argues that it was error to allow the admission of statements allegedly made by Parrish, Jordan, and Hunter. Specifically, she asserts that it was error to allow into evidence the entire videotaped statements she made to police because during questioning the police referenced statements Parrish and Hunter had made to them.
Gobble did not raise this issue at trial; therefore, we review this issue for plain error. See Rule 45A, Ala.R.App.P.
The pertinent portion of the transcript of Gobble’s third statement is as follows:
*958 “[Gobble]: I was just patting him on the back, trying to calm him back down. I put the blanket over him and started patting him.
“[McCord]: Ok. About what time was this?
“[Gobble]: I believe it was (inaudible) when I went in there to pick him up ...
“[McCord]: Look at me.
“[Gobble]: .... calm him ... sorry.
“[McCord]: ‘Bout what time?
“[Gobble]: It had to be about 1 o’clock that morning. , .
“[McCord]: ‘Bout 1 o’clock in the morning?
“[Gobble]: Yes sir.
“[McCord]: O.K.
“[Gobble]: Cause when I went back in there ...
“[McCord]: That’s consistent with the patting noise ... o.k. David says he heard a patting noise ... he thought it was kinda rough ... we asked him did he get up and go check on it ... no he didn’t....”
(Supp. R. 287.) We have thoroughly reviewed all Gobble’s statements to police, and we find no other specific reference like the one cited above that credits statements her codefendants had made to police.
First, the above statement was Gobble’s third statement to police. Earlier we discussed that if any error occurred in the admission of the third statement it was invited by Gobble because the court gave Gobble the option of either having the videotape of her interview played to the jury or the redacted transcript read to the jury. Invited error is waived unless it rises to the level of plain error. See Snyder v. State, 898 So.2d 488, 518 (Ala.Crim.App.2003).
Also, assuming that the statement was hearsay, its admission was harmless beyond a reasonable doubt. See Belisle v. State, 11 So.3d 256, 299 (Ala.Crim.App.2007) (“Any error in the admission of hearsay testimony was harmless beyond a reasonable doubt when the testimony is cumulative to other lawfully admitted testimony.”). Gobble herself testified to similar facts that were the subject of the hearsay.
B.
Second, Gobble asserts that it was error to allow the admission of the DCF records relating to Jewell because, she argues, they contained prejudicial statements indicating that Gobble had failed to care for her daughter.
 These records were first introduced and admitted as defense exhibits 2 through 5. The State then introduced a similar exhibit as State’s exhibit number 34.
“When one party opens the door to otherwise inadmissible evidence, the doctrine of ‘curative admissibility’ provides the opposing party with ‘the right to rebut such evidence with other illegal evidence.’ McElroy’s Alabama Evidence, § 14.01, p. 49 (5th ed. 1996). ‘[T]he law [is] that even though a party introduces evidence that may be immaterial or illegal, his opponent has the right to rebut such evidence and this right is unconditional’ Clark v. State, 54 Ala.App. 183, 186, 306 So.2d 51, 54 (1974). ‘ “A party who has brought out evidence on a certain subject has no valid complaint as to the trial court’s action in allowing his opponent or adversary to introduce evidence on the same subject.” ’ Hubbard v. State, 471 So.2d 497, 499 (Ala.Crim.App.1984) (quoting Brown v. State, 392 So.2d 1248, 1260 (Ala.Crim.App.1980), cert. denied, 392 So.2d 1266 (Ala.1981)).”
*959 Ex parte D.L.H., 806 So.2d 1190, 1193 (Ala.2001). Gobble opened the door to this information; she cannot now complain that the State’s introduction of similar evidence was error.
Also, Gobble testified that her daughter Jewell had been removed from her custody and she had been charged with the abandonment of Jewell. “Testimony that may be apparently inadmissible may be rendered innocuous by subsequent or prior lawful testimony to the same effect or from which the same facts can be inferred.” Yeomans v. State, 641 So.2d 1269, 1272 (Ala.Crim.App.1993). “The erroneous admission of evidence that is merely cumulative is harmless error.” Dawson v. State, 675 So.2d 897, 900 (Ala.Crim.App.1995).
For these reasons, if error did occur in the admission of State’s exhibit 34, it was harmless. See D.L.H., supra.
C.
Third, Gobble argues that it was error to allow the admission into evidence of Jewell’s medical records because, she argues, they contained statements to the effect that Gobble had abandoned Jewell.
Even assuming that error did occur, it was harmless. Gobble admitted during her testimony that the State of Florida had charged her with abandoning her daughter Jewell. Also, the record shows that Gobble introduced exhibits from the State of Florida and the State of Alabama that contained the same statement. “This Court has held that testimony apparently illegal upon submission may be rendered prejudicially innocuous by subsequent legal testimony to the same effect or from which the same facts can be inferred.” Ex parte Curtis, 502 So.2d 833, 834 (Ala.1986).
D.
Fourth, Gobble argues that the circuit court erred in allowing the autopsy report to be received into evidence without the coroner’s testifying. Specifically, she argues that the admission of the autopsy report violates her right to confront her accusers pursuant to Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).
The record shows that during Officer McCord’s testimony the autopsy report was admitted by agreement. (R. 297.) Officer McCord testified that he was present during the autopsy conducted by State Medical Examiner Dr. Song W. Wong. Dr. Wong compiled a report of his autopsy findings. The report indicated that Phoenix died of head injuries. The report was consistent with Dr. Salne’s testimony. The autopsy report did indicate that Phoenix had fractured ribs, and Dr. Saíne testified that the x-rays at the hospital did not show fractured ribs but that Phoenix had bruising on his chest. However, Dr. Saíne also testified that “You may not even start to see rib fractures on a child until they may be several days old.” (R. 476.) Phoenix’s cause of death was not contested.
In Perkins v. State, 897 So.2d 457 (Ala.Crim.App.2004), we addressed whether it was a violation of Crawford v. Washington to admit an autopsy report without the coroner’s testimony. We stated:
“In Cranford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), the United States Supreme Court held that the admission of a wife’s out-of-court statements to police officers, regarding an incident in which the defendant, her husband, allegedly stabbed the victim, violated the Confrontation Clause. The Supreme Court stated that an out-of-court statement by a witness that is testimonial is barred under the *960 Confrontation Clause, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether such statement is deemed reliable by the trial court, abrogating its previous holding in Ohio v. Roberts [, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) ]. While the Supreme Court applied a stricter standard to the admission of testimonial hearsay, however, it did not do so with regard to nontestimonial hearsay, noting:
“ ‘Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers’ design to afford the States flexibility in their development of hearsay law — as does Roberts, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether.’
“541 U.S. at 68, 124 S.Ct. at 1374, 158 L.Ed.2d at 203.
“Unlike the hearsay in Crawford v. Washington, the hearsay at issue in this case is nontestimonial in nature — an autopsy report on the victim, Wysteria Mathews. As the Court noted in White-. ‘[w]here [the] proffered hearsay has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule, the Confrontation Clause is satisfied.’ 502 U.S. at 356, 112 S.Ct. [736].
“Both Alabama and federal caselaw have recognized that the business records exception is a firmly rooted exception to the hearsay rule. See, e.g., McNabb v. State, 887 So.2d 929, 969 (Ala.Crim.App.2001); Ohio v. Roberts, 448 U.S. at 66 n. 8, 100 S.Ct. 2531. Moreover, under Alabama law, ‘An autopsy report made in the regular course of business is admissible under the business records exception.’ 2 Charles W. Gamble, McElroy’s Alabama Evidence § 254.01(18) (5th ed. 1996) (footnote omitted). See also Adams v. State, 955 So.2d 1037, 1072-73 (Ala.Crim.App.2003); Baker v. State, 473 So.2d 1127, 1129 (Ala.Crim.App.1984). The results of Dr. Embry’s autopsy and the supporting materials are business records, which bear the earmark of reliability or probability of trustworthiness and further the ‘“integrity of the fact-finding process,” ’ see Coy v. Iowa, 487 U.S. 1012, 1020, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988) (quoting Kentucky v. Stincer, 482 U.S. 730, 736, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987)); because this evidence satisfies the core value of the Confrontation Clause, the State did not have to establish Dr. Embry’s unavailability.”
897 So.2d at 463-65. See also Sharifi v. State, 993 So.2d 907 (Ala.Crim.App.2008).
Based on the facts in this case, we hold that there was no Crawford violation in admitting the autopsy report. See Perkins, supra.
X.
Gobble next argues that the circuit court erred in allowing the prosecutor to use a baby doll during her cross-examination. She asserts that the doll was merely a “prop,” that it had no probative value, and that it unduly prejudiced her.
The record shows that during Gobble’s cross-examination the prosecutor asked Gobble to hold the doll and to demonstrate to the court how Phoenix had hit his head on the crib. She complied. (R. 695.)
Defense counsel’s only objection was that the doll was not the same size as Phoenix. Counsel then asked the court to instruct the jury that the doll was not similar in size. The court indicated that it would consider the matter later in the trial. (R. 693.) Gobble stated during her *961 testimony that the doll was similar in size to her son.
“Demonstrations and experiments are permitted or prohibited in the trial court’s discretion. Thus, Alabama appellate courts have affirmed trial court decisions permitting an experiment on cross-examination to test the defendant’s ability to calculate interest as he said he had; a demonstration using a mannequin and the defendant herself to discredit her assertion that the prosecuted homicide happened accidentally; a demonstration of the defendant’s version of how a fight occurred, the solicitor playing the deceased and the defendant playing himself; a demonstration wherein the defendant made prints of his bare feet in the sawdust on the courtroom floor; a demonstration by the defendant of the extent to which his injuries had impaired his ability to walk; and a demonstration between a brain damaged child and a special education therapist calculated to show the child’s physical and mental abilities.”
William A. Schroeder and Jerome A. Hoffman, Alabama Evidence § 12:25 (3d ed. 2006) (footnotes omitted).
In Ivey v. State, 369 So.2d 1276 (Ala.Crim.App.1979), this Court considered whether the circuit court erred in allowing the prosecutor to cross-examine the defendant using a full-size mannequin to test the credibility of the defendant’s version of the events. We stated:
“The appellant also argues that her Fifth Amendment rights against self-incrimination were violated through the manner in which she was cross examined by the prosecution. During her cross examination the appellant was required to hold the pistol in a manner consistent with the State’s theory of how the weapon must have been held according to the trajectory of the bullet. This was inconsistent with the manner in which the appellant testified she held the weapon on direct examination.
“An accused on trial for a criminal offense cannot be required to give or furnish testimony against himself either by way of spoken words or by act. Hubbard v. State, 283 Ala. 183, 215 So.2d 261 (1968); Dean v. State, 240 Ala. 8, 197 So. 53 (1940); Article I, § 6, Constitution of Alabama of 1901. However where an accused elects to testify for himself, he waives his constitutional right not to be compelled to give evidence against himself. Brown v. United States, 356 U.S. 148, 154, 78 S.Ct. 622, 626, 2 L.Ed.2d 589 (1958); Lipscomb v. State, 32 Ala.App. 623, 29 So.2d 145 (1947); Green v. State, 218 Ala. 363, 118 So. 506 (1928); Carpenter v. State, 193 Ala. 51, 69 So. 531 (1915); [Kelly] v. State, 160 Ala. 48, 49 So. 535 (1909); Cotton v. State, 87 Ala. 103, 6 So. 372 (1889). A defendant who has introduced himself as a witness may be cross examined and compelled to do what would be material and competent of any other witness. [Coats ] v. State, 253 Ala. 290, 45 So.2d 35 (1950); Smith v. State, 247 Ala. 354, 24 So.2d 546 (1946). ‘An accused who has testified in his own behalf may be cross-examined as to any facts or matters, even though collateral, which are inconsistent with the testimony given by him on direct examination, and tend to qualify or contradict such testimony, or to show its improbability.’ 98 C.J.S. Criminal Law § 401(3) (1957). See also Nicholson v. State, 150 Ala. 80, 43 So. 365 (1907); Stevens v. State, 133 Ala. 28, 32 So. 270 (1902); Eaton v. State, 8 Ala.App. 136, 63 So. 41 (1913).
“The general rule on requiring the accused to demonstrate an encounter, action, or position on cross examination is stated at 171 A.L.R. 1144, 1190.
*962 “ ‘The right of the prosecution, upon cross examination of a defendant, to require him to give some physical demonstration of matters such as his actions or position at the time of the alleged offense, where he has voluntarily testified concerning those matters on his direct examination, has been sustained as proper cross-examination in quite a variety of circumstances, as shown by the following cases. While not all of them mention the question of constitutional privilege, the general import of these cases appears to be that by voluntarily testifying to and opening up the matter on his direct examination, or perhaps merely by voluntarily becoming a witness in the case, the defendant had waived such privilege as he may have originally had against giving the particular demonstration.’
“In Lumpkin v. State, 19 Ala.App. 272, 97 So. 171 (1923), it was held not error to require, upon cross examination, a defendant in a homicide case, who had become a witness in his own behalf, to illustrate before the jury how the fatal fight occurred by showing the motions and actions of the parties to the encounter, with the State’s attorney taking the part of the deceased. Also in [Coats] v. State, 253 Ala. 290, 45 So.2d 35 (1950), it was held not error to permit the appellant, at the request of the State during its cross examination and over the objection of defense counsel, to leave the witness stand and sit in a chair, in view of the jury, so as to better demonstrate the manner in which the appellant contended he was holding the gun at the time of its discharge.
“The scope and extent of cross examination rest in the sound discretion of the trial court, Bridges v. State, 284 Ala. 412, 225 So.2d 821 (1969), as do the scope and extent of experiments and demonstrations. Campbell, supra; McElroy, §§ 81.01(3), 81.02(1). As a general rule experiments and demonstrations should be permitted to be made in the courtroom in the jury’s presence where it reasonably appears that the experiment will aid the jury in ascertaining the truth, where there exists a substantial similarity of conditions and where the experiment will not unfairly prejudice the defendant.”
369 So.2d at 1279-80. See also Annot., Propriety of Requiring Criminal Defendant to Exhibit Self, or Perform Physical Act, or Participate in Demonstration, During Trial and in Presence of Jury, 3 A.L.R.4& 374 (1981).
The circuit court did not abuse its discretion in allowing the prosecutor to use a baby doll as a demonstrative aid during Gobble’s cross-examination so that Gobble could demonstrate her version of the events leading to Phoenix’s death. See Ivey, supra.
XI.
Gobble next argues that the circuit court erred in precluding her from presenting evidence of the guilt of third parties. Specifically, she argues that she was prevented from presenting evidence that her codefendants, Edgar Parrish and Samuel Hunter, had a history of violence and criminal activity.”[9]
The record shows that during cross-examination of Officer McCord, the following occurred:
*963 “[Defense counsel]: Had you done a background investigation on either Edgar Parrish or Samuel Hunter?
“[Officer McCord]: We ran criminal histories on both. We ran criminal histories on everybody.
“[Defense counsel]: What did you come up with on Edgar Parrish?
“[Prosecutor]: Object. He’s not a witness in this case.
“The Court: Okay. Sustained.”
(R. 418.) Gobble made no offer of proof, see Jennings v. State, 513 So.2d 91 (Ala.Crim.App.1987); therefore, we review this claim for “plain error.” See Rule 45A, Ala.R.App.P.
“Alabama courts have long recognized the right of a defendant to prove his innocence by presenting evidence that another person actually committed the crime. See Ex parte Walker, 623 So.2d 281 (Ala.1992); Thomas v. State, 539 So.2d 375 (Ala.Crim.App.1988); Green v. State, 258 Ala. 471, 64 So.2d 84 (1953); Underwood v. State, 239 Ala. 29, 193 So. 155 (1939); Orr v. State, 225 Ala. 642, 144 So. 867 (1932); Houston v. State, 208 Ala. 660, 95 So. 145 (1923); Tennison v. State, 183 Ala. 1, 62 So. 780 (1913); McGehee v. State, 171 Ala. 19, 55 So. 159 (1911); McDonald v. State, 165 Ala. 85, 51 So. 629 (1910). In addition, Alabama courts have also recognized the danger in confusing the jury with mere speculation concerning the guilt of a third party:
“ ‘It generally is agreed that the defense, in disproving the accused’s own guilt, may prove that another person committed the crime for which the accused is being prosecuted.... The problem which arises in the application of this general rule, however, is the degree of strength that must be possessed by the exculpatory evidence to render it admissible. The task of determining the weight that must be possessed by such evidence of another’s guilt is a difficult one.’
“Charles W. Gamble, McElroy’s Alabama Evidence § 48.01(1) (5th ed. 1996). To remove this difficulty, this Court has set out a test intended to ensure that any evidence offered for this purpose is admissible only when it is probative and not merely speculative. Three elements must exist before this evidence can be ruled admissible: (1) the evidence ‘must relate to the “res gestae” of the crime’; (2) the evidence must' exclude the accused as a perpetrator of the offense; and (3) the evidence ‘would have to be admissible if the third party was on trial.’ See Ex parte Walker, 623 So.2d at 284, and Thomas, 539 So.2d at 394-96.”
Ex parte Griffin, 790 So.2d 351, 354-55 (Ala.2000). The evidence Gobble sought to introduce did not meet the three pronged test set out in Griffin. Also, “[e]vidence of a person’s character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion.” Rule 404(a), Ala. R.Evid. The circuit court committed no error in excluding this evidence.
XII.
Gobble next argues that the circuit court erred in admitting autopsy photographs because, she says, they were irrelevant and unduly prejudicial. Specifically, she challenges the court’s admission of a photograph showing Phoenix’s exposed skull and a photograph showing Phoenix’s nude body.
We have repeatedly held that autopsy photographs are admissible in a defendant’s murder trial. “ ‘[A]utopsy photographs depicting the character and location of wounds on a victim’s body are *964 admissible even if they are gruesome, cumulative, or relate to an undisputed matter.’” Jackson v. State, 791 So.2d 979, 1016 (Ala.Crim.App.2000), quoting Perkins v. State, 808 So.2d 1041, 1108 (Ala.Crim.App.1999). “We must admit that the photographs were gruesome, particularly since the victim was an infant. However, they were necessary to demonstrate to the jury the extent of [the victim’s injuries.]” Dabbs v. State, 518 So.2d 825, 829 (Ala.Crim.App.1987). Moreover, this Court has upheld the admission of photographs showing an exposed skull because the photographs were relevant to show the extent of the head injuries. See Hamilton v. State, 492 So.2d 331 (Ala.Crim.App.1986).
Also, the court instructed the jury that the photographs were not admitted to “inflame or prejudice you.” (R. 814.) The circuit court did not abuse its discretion in allowing the photographs to be admitted into evidence. See Dabbs, supra.
XIII.
Gobble argues that the circuit court erred in allowing irrelevant and non-character evidence to impeach the credibility of two defense witnesses — Dallas Gobble Sr., Gobble’s father, and his wife, Carmen Gobble.
The record shows that Dallas Gobble testified about his daughter’s relationship with Hunter. He testified that Hunter was the dominant partner in the relationship and that he had been around Hunter when he was violent. Dallas further testified that his daughter was a good mother and that she had been learning how to be a proper mother to Jewell. Dallas said that he worried about his daughter and her children. Carmen Gobble testified that in 2003 after Jewell was born Gobble and Hunter moved in with and Dallas for about three months. She said that Hunter was the dominant one in the relationship and that she had seen him when he was violent. Carmen also testified that Gobble was a loving mother.
On cross-examination the prosecutor elicited testimony that showed that both Dallas and Carmen had had little contact with Gobble and her children. These facts were relevant to the witness’s credibility.
“Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness’ story to test the witness’ perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, i.e., discredit, the witness.”
Davis v. Alaska, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). “The scope of cross-examination in Alabama is quite broad. Rule 611(b), Ala.R.Evid. This means that any question may be asked on cross-examination that is relevant either to any substantive issue in the case or to the witness’s credibility.” Ex parte Deardorff, 6 So.3d 1235, 1241 (Ala.2008).
“It is well settled that ‘[a] party is entitled to a thorough and sifting cross-examination of the witnesses against him,’ McMillian v. State, 594 So.2d 1253, 1261 (Ala.Crim.App.1991), remanded on other grounds, 594 So.2d 1288 (Ala.1992), opinion after remand, 616 So.2d 933 (Ala.Crim.App.1993), citing Perry v. Brakefield, 534 So.2d 602 (Ala.1988), and § 12-21-137, Ala.Code 1975, and that a party should be given ‘wide latitude on cross-examination to test a witness’s partiality, bias, intent, credibility, or prejudice, or to impeach, illustrate, or test the accuracy of the wit *965 ness’s testimony or recollection as well as the extent of his knowledge.’ Williams v. State, 710 So.2d 1276, 1327 (Ala.Crim.App.1996), aff'd, 710 So.2d 1850 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). It is equally well established, however, ‘that the latitude and extent of cross-examination are matters which of necessity rest largely within the sound discretion of the trial court, and rulings with respect thereto will not be revised on appeal except in extreme cases of abuse.’ Long v. State, 621 So.2d 383, 388 (Ala.Crim.App.1993), cert. denied, 510 U.S. 932, 114 S.Ct. 345, 126 L.Ed.2d 310 (1993), quoting Beavers v. State, 565 So.2d 688, 689 (Ala.Crim.App.1990).”
Reeves v. State, 807 So.2d 18, 38 (Ala.Crim.App.2000).
The circuit court did not abuse its discretion in allowing the prosecutor to thoroughly cross-examine both Dallas Gobble and Carmen Gobble.
XIV.
Gobble next argues that her “presumption of innocence” was destroyed when the jury was allowed to see her in shackles and an orange prison-issued jumpsuit during her third videotaped statement to police.
First, we note that the State attempted to introduce a redacted transcript of Gobble’s third statement to police but defense counsel strenuously requested that the entire videotape be shown to the jury because, he said, it showed the coercion exercised by the police. Thus, if any error occurred, it was invited. Invited error operates to waive any error unless it rises to the level of plain error. See Ex parte Sharp, [Ms. 1080959, December 4, 2009] — So.3d-,-(Ala.2009).
 In Barber v. State, 952 So.2d 393 (Ala.Crim.App.2005), we addressed whether it was reversible error to allow a videotape of the defendant’s statement to be shown to the jury when the videotape showed the defendant wearing handcuffs. In concluding that there must be a showing of “actual prejudice,” we stated:
“[Djuring the third interview with Edger, the appellant is wearing handcuffs. In Gates v. Zant, 863 F.2d 1492,1501-02 (11th Cir.1989), which the appellant cites, the United States Court of Appeals for the Eleventh Circuit addressed a similar situation as follows:
“ ‘Gates’ other challenge to the videotaped confession is that its admission was unduly prejudicial because it portrayed him in handcuffs. As we have noted previously, although the handcuffs are not always visible, it is evident throughout the fifteen-minute tape that the defendant is handcuffed. We are aware of no cases which address the propriety of handcuffing during a videotaped confession. Nonetheless, the resolution of the issue is apparent from earlier cases addressing handcuffing in and around trials.
“ ‘The principal difficulty ¿rising from shackling or handcuffing a defendant at trial is that it tends to negate the presumption of innocence by portraying the defendant as a bad or dangerous person. The Supreme Court has referred to shackling during trial as an “inherently prejudicial practice” which may only be justified by an “essential state interest specific to each trial.” Holbrook v. Flynn, 475 U.S. 560, 569, 106 S.Ct. 1340, 1346, 89 L.Ed.2d 525 (1986). See also Illinois v. Allen, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970). This court recently has extended the general prohibition against shackling *966 at trial to the sentencing phase of a death penalty case. Elledge v. Dugger, 823 F.2d 1489, 1450-52 (11th Cir.1987), modified, 833 F.2d 250 (1987), cert. denied, [485] U.S. [1014], 108 S.Ct. 1487, 99 L.Ed.2d 715 (1988).
“ ‘On the other hand, a defendant is not necessarily prejudiced by a brief or incidental viewing by the jury of the defendant in handcuffs. Allen v. Montgomery, 728 F.2d 1409, 1414 (11th Cir.1984); United States v. Diecidue, 603 F.2d 535, 549-50 (5th Cir.1979), cert. denied sub nom. Antone v. United States, 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781, 446 U.S. 912, 100 S.Ct. 1842, 64 L.Ed.2d 266 (1980); Wright v. Texas, 533 F.2d 185, 187-88 (5th Cir.1976); Jones v. Gaither, 640 F.Supp. 741, 747 (N.D.Ga.1986), aff'd without opinion, 813 F.2d 410 (11th Cir.1987). The new fifth circuit is among those circuits which adhere to this rule. King v. Lynaugh, 828 F.2d 257, 264-65 (5th Cir.1987), vacated on other grounds, 850 F.2d 1055 (5th Cir.1988); see also United States v. Williams, 809 F.2d 75, 83-86 (1st Cir.1986), cert. denied, 481 U.S. 1030, 107 S.Ct. 1959, 2469, 2484, 95 L.Ed.2d 531, 877, 96 L.Ed.2d 377 (1987); United States v. Robinson, 645 F.2d 616, 617-18 (8th Cir.1981), cert. denied, 454 U.S. 875, 102 S.Ct. 351, 70 L.Ed.2d 182 (1981). In these latter eases, the courts generally have held that the defendant must make some showing of actual prejudice before a retrial is required.
“ ‘Thus, the ease law in this area presents two ends of a spectrum. This case falls closer to the “brief viewing” end of the spectrum and requires a showing of actual prejudice before a retrial is required. The prosecution showed the fifteen-minute tape twice during several days of trial. The handcuffs were only visible during short portions of the tape.
“‘Gates has made no attempt to show that he suffered actual prejudice because the jury saw him in handcuffs. Our independent examination of the record also persuades us that he did not suffer any prejudice. Although defense counsel strenuously objected to the admission of the videotape, he did not object to the handcuffing in particular. He did not ask for a cautionary instruction or a poll of the jury. Furthermore, the videotape at issue here was taken at the scene of the crime, not at the police station. Thus, jurors likely would infer that handcuffing was simply standard procedure when a defendant is taken outside the jail. The viewing of the defendant in handcuffs on television rather than in person further reduces the potential for prejudice. In light of the foregoing facts, and the fact that Gates sat before the jury without handcuffs for several days during his trial, we conclude that the relatively brief appearance of the defendant in handcuffs on the videotape did not tend to negate the presumption of innocence or portray the defendant as a dangerous or bad person. We therefore conclude on the particular facts of this case that the handcuffing of Gates during the videotaped confession does not require a new trial.’
“In this case, although the appellant is clearly wearing handcuffs during the interview, because the videotape is blurry in places, the handcuffs are not plainly visible all of the time. Rather, they are more noticeable when the appellant is moving his hands. Also, as in Gates, the defense did not object to the admission *967 of the videotape on this ground or ask for a cautionary instruction; the viewing was on television rather than in person; and the appellant did not wear handcuffs or shackles during the actual trial. Finally, the appellant had been arrested on an outstanding warrant and not on the capital murder charge at the time he made his statement. Therefore, under the facts of this case, we do not conclude that there was any plain error in this regard.”
Barber v. State, 952 So.2d 393, 445-46 (Ala.Crim.App.2005).
We have reviewed the videotape of Gobble’s third statement. At the beginning of questioning Gobble was in handcuffs but within seconds those handcuffs were removed. Gobble is sitting for the entire statement and is wearing an orange jumpsuit, but the jumpsuit appears to have no identifying marks or writing on the front. There is no evidence in the record that Gobble was wearing handcuffs or shackles during her trial. As did the Court in Barber, we find no evidence of prejudice. Accordingly, we find no plain error in regard to this claim.
XV.
Gobble next argues that the circuit court erred in prohibiting her from presenting the testimony of an expert in the guilt phase.
The record shows that at the guilt phase Gobble informed the court that she wished to call Dr. David Ghostly, a psychologist. Defense counsel stated “[H]e’s done tests on her to be able to give his opinion as to whether or not she could form an intent.” Counsel further stated that Dr. Ghostly would testify that based on his review of the records, “the only person who has ever been charged with committing violence on this child has been Samuel David Hunter, not her.” (R. 748.) The State objected and argued that Dr. Ghostly’s testimony would invade the province of the jury. The circuit court did not allow Dr. Ghostly to testify. Dr. Ghostly did testify at the penalty phase that Gobble suffered from postpartum depression. On appeal, Gobble argues for the first time that the circuit court erred in not allowing Dr. Ghostly to testify in the guilt phase about her postpartum depression. This specific assignment of error was not raised before the circuit court; thus, we review this issue for plain error. See Rule 45A, Ala. R.App.P.
In Wilkerson v. State, 686 So.2d 1266 (Ala.Crim.App.1996), this Court addressed whether it was reversible error for the circuit court to exclude evidence from an expert that the defendant did not have the ability to form intent. In affirming the circuit court’s ruling, this Court stated:
“The appellant contends that the trial court erred by not allowing him to question his expert witness, Dr. Alan Blotcky, a clinical psychologist who performed a court-ordered evaluation of the appellant, as to whether the appellant had the ability to form the requisite intent to commit murder. During an offer of proof in the trial court, the appellant’s counsel explained that Dr. Blotcky would testify that the appellant had a diminished capacity to form the requisite intent to commit murder because of the combined effect of intoxication at the time of the crime, borderline intellectual function, and mental disease or defect (i.e., passive-aggressive personality). ‘It has been held traditionally in this country that an expert witness cannot give his opinion upon an ultimate issue in the case.’ Charles W. Gamble, McElroy’s Alabama Evidence § 127.01(5)(d) (4th ed. 1991). More specifically, ‘[a] witness, be he expert or lay, cannot give his opinion when such *968 constitutes a legal conclusion or the application of a legal definition.’ Gamble, supra, at § 128.07.
“The appellant refers us to our opinion in Bailey v. State, 574 So.2d 1001, 1003 (Ala.Cr.App.1990), where we stated: ‘[T]he modern trend is in the direction of permitting experts to give their opinions upon ultimate issues, of which the final determination rests with the jury.’ The modern trend culminated in the adoption of Rule 704 of the Federal Rules of Evidence, which abandoned the ultimate issue rule. C. Gamble, supra, at § 127.01(5)(d). However, subsection (b) of Rule 704 contains the following important limitation:
“ ‘No expert witness testifying with respect to the mental state or condition of a defendant in a criminal case may state an opinion or inference as to whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto.’
“Stated differently,
“ ‘Rule 704(b) does not prohibit an expert witness from stating his opinion and reviewing facts from which a jury could determine whether a defendant had the requisite criminal intent. ... Rather, the rule prohibits an expert witness from testifying that a defendant did or did not possess the requisite mental intent at the time of the crime.’
“United States v. Orr, 68 F.3d 1247, 1252 (10th Cir.1995), cert. denied, 516 U.S. 1064, 116 S.Ct. 747, 133 L.Ed.2d 695 (1996). See also United States v. Frisbee, 623 F.Supp. 1217, 1222-223 (N.D.Cal.1985) (‘the defendant’s experts will not be allowed to state an opinion or inference as to whether the defendant did or did not form a specific intent to kill.... No testimony directly or indirectly opining on the issue of specific intent will be allowed’). Thus, even the more permissive federal rule does not allow an expert witness to state an opinion as to the ultimate issue of whether a defendant had the requisite mental state to commit murder. Here, it is clear from the record that the appellant sought only to elicit Dr. Blotcky’s opinion on the issue of specific intent. Therefore, even under the modern trend, the appellant’s argument that Dr. Blotcky should have been allowed to testify concerning the appellant’s intent fails.
“This Court addressed an almost identical issue in McCowan v. State, 412 So.2d 847 (Ala.Cr.App.1982). In McCowan, citing Ex parte Dial, 387 So.2d 879 (Ala.1980), we held that the trial court did not err in disallowing the appellant’s expert witness from stating ‘the legal conclusion that the appellant could not have formed the requisite intent for murder,’ and had properly allowed the expert to testify ‘that, hypothetically, one suffering from an “isolated explosive disorder” would not be able to “knowingly and intentionally appreciate what he was doing.’” 412 So.2d at 849. (Emphasis added.) We are aware of no case holding that a witness can testify as to whether the defendant has the ability to form the requisite intent to commit the charged offense. We find no error on the part of the trial court in disallowing Dr. Blotcky from testifying as to the appellant’s ability to form the requisite intent to commit murder. McCowan.”
686 So.2d at 1278-79. See Prof. William A. Schroeder and Jerome A. Hoffman, Alabama Evidence § 7.36 (3 ed. 2009).
Based on our holding in Wilkerson and the record in this case, we cannot say that *969 the circuit court committed reversible error in prohibiting Gobble from presenting the expert testimony of Dr. Ghostly at the guilt phases of her trial.
XVI.
Gobble next argues that the circuit court erred in failing to exclude a court document seeking to terminate Gobble’s parental rights in regard to her daughter Jewell. The document stated that Gobble had murdered Jewell’s sibling, Phoenix.
The document that Gobble is referencing on appeal is part of a 555-page document from the Hillsborough Kids, Inc., that was introduced and admitted by Gobble and labeled defense exhibit 2. The exhibit contains a copy of a “Motion to terminate Parental Rights” that appears to have been filed in the Houston County Juvenile Court. The document contains the following statement: “The parents of this child have failed to protect this child’s sibling, who was murdered by the mother.” (C. 782.)
Error, if any, was invited by Gobble. This exhibit was offered and introduced by Gobble.
“ ‘Under the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby.’ Phillips v. State, 527 So.2d 154, 156 (Ala.1988). ‘The doctrine of invited error applies to death-penalty eases and operates to waive any error unless the error rises to the level of plain error.’ Snyder v. State, 893 So.2d 488, 518 (Ala.Crim.App.2003).”
Robitaille v. State, 971 So.2d 43, 59 (Ala.Crim.App.2005). “ ‘It would be a sad commentary upon the vitality of the judicial process if an accused could render it impotent by his own choice.’” Murrell v. State, 377 So.2d 1102, 1105 (Ala.Crim.App.1979), quoting Aldridge v. State, 278 Ala. 470, 474, 179 So.2d 51, 54 (1965).
Here, the complained-of statement was one sentence in a 555-page document introduced at trial by Gobble. In total, Gobble introduced over 1,600 pages of documents from the Florida Department of Investigation, DCF Court, and Hillsbor-ough Kids, Inc. We cannot say that any plain error occurred in this case, given the numerous documents admitted into evidence. See Rule 45A, Ala.R.App.P.
XVII.
Gobble next argues that numerous instances of prosecutorial misconduct deprived her of her constitutional right to a fair trial. She cites several instances in support of this contention.
The record shows that Gobble did not object to any of the challenged comments. As the Alabama Supreme Court stated in Ex parte Windsor, 683 So.2d 1042 (Ala.1996):
“ ‘ “While this failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice.” Ex parte Kennedy, 472 So.2d [1106,] at 1111 [ (Ala.1985) ] (emphasis in original). “This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.” Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).’ ”
683 So.2d at 1061, quoting Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990).
Moreover,
*970 “In reviewing these claims of alleged improper prosecutorial argument, we must evaluate the comments and their impact in the context of the entire argument, and not view the allegations of improper argument in the abstract. Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala.1991). Also,
“ ‘ “This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in (Question to be particularly harmful.” ’
“Kuenzel v. State, 577 So.2d 474, 489 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987). We also point out that the control of a closing argument is in the broad discretion of the trial court. Thomas v. State, 601 So.2d 191 (Ala.Cr.App.1992). That court is in the best position to determine if counsel’s argument is legitimate or if it degenerates into impropriety. Thomas, supra. ‘In judging a prosecutor’s closing argument, the standard is whether the argument “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” ’ Bankhead v. State, 585 So.2d 97, 107 (Ala.Crim.App.1989), quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).”
Acklin v. State, 790 So.2d 975, 1002 (Ala.Crim.App.2000). A prosecutor may argue all legitimate inferences that may be drawn from the evidence. Taylor v. State, 666 So.2d 36, 64 (Ala.Crim.App.1994). The standard of review is not whether the defendant was prejudiced, but whether the comment “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” Darden v. Wainwright, 477 U.S. 168, 169, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). With these principles in mind, we review the challenged comments.
A.
First, Gobble argues that the prosecutor argued facts that were never introduced at trial Specifically, she argues that the prosecutor argued in opening statement that Gobble “didn’t want Jewell back in any manner or fashion” and that Phoenix could have suffered the injuries he suffered only as the result of an automobile accident or physical abuse.
The documents admitted by Gobble showed that she relinquished her parental rights as to Jewell. Dr. Saíne testified that Phoenix could have obtained the injuries he suffered only in one of two ways— either an automobile accident or from child abuse. Also, Gobble testified that she signed a form in October of 2004 stating her intention to terminate her parental rights.
The prosecutor’s statements were supported by the evidence presented at trial and were within the scope of permissible argument. See Taylor, supra.
B.
Gobble next argues that the prosecutor improperly vouched for the credibility of the State’s case when he made the following argument in closing:
“When we put on the statements that the police took, that she says Tierra Gobble, she’s the one who did it. And they want to say it’s an interrogation. It was only solved in two or three days. *971 Just get it through your mind. You will never forget. It’s solved. We brought you the evidence. I submit to you we proved to you in this case. The detectives did an outstanding job. They got the statements. They got the evidence in this case.”
(R. 803-04.)
The State asserts in its brief on appeal that this argument was a reply-in-kind to the argument made by defense counsel. Defense counsel argued in closing that Gobble had been “railroaded.” We agree that the prosecutor’s remarks were a reply to that argument. “ ‘A prosecutor has a right based on fundamental fairness to reply in kind to the argument of defense counsel.’ ” Johnson v. State, 828 So.2d 1, 47 (Ala.Crim.App.2001), quoting DeBruce v. State, 651 So.2d 599, 609 (Ala.Crim.App.1993).
XVIII.
Gobble next argues that there was not sufficient evidence to convict her of capital murder because, she argues, there was no evidence that she intended to murder Phoenix. She further asserts that there was no direct evidence linking her to Phoenix’s murder and that the circuit court should have granted her motion for a judgment of acquittal.
Gobble was indicted for murder defined as capital by § 13A-5-40(a)(15), Ala.Code 1975, because the victim was less than 14 years of age. To convict under § 13A-5-40(a)(15), the State must prove that an intentional murder, as defined in § 13A-6-2(a)(l), Ala.Code 1975, occurred and that the victim was under the age of 14.
“In reviewing a conviction based on circumstantial evidence, this court must view that evidence in a light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude.”
Cumbo v. State, 368 So.2d 871, 874 (Ala.Crim.App.1979).
“In Underhill on Criminal Evidence, § 540(3d ed. 1923), we find the following statement regarding proof of intent in an attempted murder charge:
“ ‘ “Thus, as a general rule, the force or violence which was employed must be proven to have been intentional.... The intention to do great bodily harm, to murder or commit any other crime by means of an assault, may be inferred from the circumstances. Circumstantial evidence is usually the only available evidence of intention aside from the declarations of the accused. The intention may be inferred from the force or direction, or from the natural or contemplated result of the violence employed, from the weapon or implement used by the accused, from his threats or prior conduct towards the person assaulted, and generally from the extent and effect of the injury inflicted, or from any deliberate action, which is naturally attempted and usually results in danger to the life of another.” ’ ”
Long v. State, 668 So.2d 56, 60 (Ala.Crim.App.1995), quoting Bishop v. State, 482 So.2d 1322, 1326 (Ala.Crim.App.1985). “ ‘[T]he element of intent, being a state of mind or mental purpose, is usually incapable of direct proof, [and] it may be inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances.’ ” Jones v. State, 591 So.2d 569, 574 (Ala.Crim.App.1991), quoting *972 Johnson v. State, 390 So.2d 1160, 1167 (Ala.Crim.App.1980). Moreover,
“ ‘A person acts intentionally with respect to a result or to conduct described by a statute defining an offense, when his purpose is to cause that result or to engage in that conduct.’ § 13A-2-2(l), Ala. Code 1975. Furthermore,
“ ‘ “[t]he question of a defendant’s intent at the time of the commission of the crime is usually an issue for the jury to resolve.” Rowell v. State, 570 So.2d 848, 850 (Ala.Crim.App.1990), citing Crowe v. State, 435 So.2d 1371, 1379 (Ala.Crim.App.1983). Intent may be “ ‘inferred from the character of the assault, the use of a deadly weapon and other attendant circumstances.’ ” Jones v. State, 591 So.2d 569, 574 (Ala.Crim.App.1991), quoting Johnson v. State, 390 So.2d 1160, 1167 (Ala.Crim.App.), cert. denied, 390 So.2d 1168 (Ala.1980).’ ”
Sale v. State, 8 So.3d 330, 339 (Ala.Crim.App.2008), quoting Butler v. State, 781 So.2d 994, 997 (Ala.Crim.App.2000).
Based on the evidence set out in the beginning of this opinion, there was more than sufficient evidence to present the case to the jury for its determination. See Ward v. State, 814 So.2d 899, 912 (Ala.Crim.App.2000) (upholding capital murder conviction in death of child less than 14 years of age over challenge to sufficiency of the evidence). We see no reason to disturb the jury’s verdict in this case.
XIX.
Gobble next argues that the circuit court denied counsel his right to argue reasonable inferences from the evidence when it sustained the prosecutor’s objection to an argument made by defense counsel in the guilt phase. During defense counsel’s closing argument, the following occurred:
“[Defense counsel]: Think about that. That is a heavy piece of evidence, ladies and gentlemen, where Samuel David Hunter knocked a hole in Sheetrock. You know, I’m not physically in shape anymore. But at the time when I was, and I don’t think I — one time I was six one, two hundred and forty pounds of pretty good muscle. I don’t think I could ever knock a hole in Sheetrock. You’ve got to have some rage on you. Not only that, you’ve got to be crazy to knock a hole in Sheetrock and throw a kid though it.
“[Prosecutor]: Objection. Objection. There [was] no testimony any child was thrown through the Sheetrock, Judge.
“The Court: Sustained.”
(R. 784-85.)
It is well established that
“ ‘During closing argument, the prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.’ Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Cr.App.1987), rev’d on other grounds, 523 So.2d 1118 (Ala.1988) (citation omitted). Wide discretion is allowed the trial court in regulating the arguments of counsel. Racine v. State, 290 Ala. 225, 275 So.2d 655 (1973). ‘In evaluating allegedly prejudicial remarks by the prosecutor in closing argument, ... each case must be judged on its own merits,’ Hooks v. State, 534 So.2d 329, 354 (Ala.Cr.App.1987), aff'd, 534 So.2d 371 (Ala.1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989) (citations omitted) (quoting Barnett v. State, 52 Ala.App. 260, 264, 291 So.2d 353, 357 (1974)), and the remarks must be evaluated in the context of the whole trial, Duren v. State, 590 So.2d 360 (Ala.Cr.App.1990), aff'd, 590 So.2d 369 (Ala. *973 1991). ‘In order to constitute reversible error, improper argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury.’ Mitchell v. State, 480 So.2d 1254, 1257-58 (Ala.Cr.App.1985) (citations omitted). ‘To justify reversal because of an attorney’s argument to the jury, this court must conclude that substantial prejudice has resulted.’ Twilley v. State, 472 So.2d 1130, 1139 (Ala.Cr.App.1985) (citations omitted).”
Coral v. State, 628 So.2d 954, 985 (Ala.Crim.App.1992).
Dallas Gobble testified that when Hunter and his daughter were living at his house he came home one day and found a hole in the drywall. However, there was no evidence that a child was thrown through the drywall. Dallas did not witness what occurred. The circuit court committed no error in sustaining the State’s objection to the above argument, by defense counsel, which was not supported by the evidence.
Also, Gobble can show no prejudice from the trial court’s action in sustaining the objection. Counsel made the argument and the prosecutor did not move to strike the argument or move for the court to instruct the jury to disregard it. Thus, any possible error was harmless beyond a reasonable doubt. See Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
XX.
Gobble next argues that the circuit court erred in its jury instructions in the guilt phase. She lists several grounds in support of this assertion.
“When reviewing a trial court’s jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them. Ingram v. State, 779 So.2d 1225 (Ala.Cr.App.1999). ‘The absence of an objection in a case involving the death penalty does not preclude review of the issue; however, the defendant’s failure to object does weigh[ ] against his claim of prejudice.’ Ex parte Boyd, 715 So.2d 852 (Ala.), cert. denied, 525 U.S. 968, 119 S.Ct. 416, 142 L.Ed.2d 338 (1998).”
Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000). As we stated in Williams v. State, 795 So.2d 753 (Ala.Crim.App.1999):
“A trial court has broad discretion in formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court’s instructions, ‘“the court’s charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.”’ Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App.1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App.1992).”
795 So.2d at 780. “When reviewing a trial court’s jury instructions, we must view them as a whole, not in bits and pieces, and as a reasonable juror would have interpreted them.” Johnson v. State, 820 So.2d 842, 874 (Ala.Crim.App.2000).
Moreover,
“An accused has the right to have the jury charged on ‘ “any material hypothesis which the evidence in his favor tends to establish.”’ Ex parte Stork, 475 So.2d 623, 624 (Ala.1985). ‘In determining whether an instruction was supported by the evidence the question is not whether the Supreme Court or Court of Criminal Appeals believes the evidence, but simply whether such evidence was presented.’ Id. ‘[E]very ac *974 cused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility.’ Ex parte Chavers, 361 So.2d 1106, 1107 (Ala.1978). ‘ “ ‘It is a basic tenet of Alabama law that “a party is entitled to have his theory of the case, made by the pleadings and issues, presented to the jury by proper instruction, ... and the [trial] court’s failure to give those instructions is reversible error.” ”” Ex parte McGriff, 908 So.2d 1024, 1035 (Ala.2004), quoting Winner Int'l Corp. v. Common Sense, Inc., 863 So.2d 1088, 1091 (Ala.2003), quoting in turn other cases. ‘In order to determine whether the evidence is sufficient to necessitate an instruction and to allow the jury to consider the defense, we must view the testimony most favorably to the defendant.’ Ex parte Pettway, 594 So.2d 1196, 1200 (Ala.1991).”
Williams v. State, 938 So.2d 440, 444-45 (Ala.Crim.App.2005).
A.
First, Gobble argues that the circuit court erred in refusing to give a jury instruction on aggravated child abuse, which, she argues, is a lesser-included offense to the capital offense of murder of a child under the age of 14. She relies on the case of Edwards v. State, 671 So.2d 129 (Ala.Crim.App.1995), to support her argument. Here, the circuit court gave jury instructions on the lesser-included offenses of manslaughter and criminally negligent homicide.
In Edwards, this Court held that the defendant, who had been indicted for murder, would have been entitled to a jury instruction on assault because there was evidence that the victim died as a result of a surgeon’s error in the surgery necessitated by the assault and not Edwards’s assault. We stated:
“In view of the evidence, had the appellant been tried on the charge of murder for which he was indicted, he would have been entitled to a jury charge on assault in the first degree as a lesser included offense of murder based on the rationale that the evidence suggested that the appellant had not, in fact, caused the victim’s death. See Parker v. State, 587 So.2d 1072, 1083 (Ala.Cr.App.1991) (trial court instructed jury on the charged offense of capital murder and on lesser included offense of assault in the first degree where appellant’s defense was that he participated in an assault on victim but that he left her alive and that she was stabbed to death by someone else after assault occurred). Compare, Dill v. State, 600 So.2d 343 (Ala.Cr.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993) (finding that trial court properly refused capital murder defendant’s requested jury charge on the lesser included offense of assault in the first degree where victim did not die until some nine months after being shot, because there was no evidence presented from which jury could have reasonably inferred that, although defendant shot victim, something else in fact had caused his death).”
671 So.2d at 131.
Gobble was charged with capital murder as defined in § 13A-5-40(a)(15), Ala.Code 1975, which makes capital: “[mjurder when the victim is less than fourteen years of age.” Aggravated child abuse is defined in § 26-15-3.1, Ala.Code 1975, as follows:
“(a) A responsible person, as defined in § 26-15-2, commits the crime of aggravated child abuse if he or she does any of the following:
*975 “(1) He or she violates the provisions of § 26-15-3 by acts taking place on more than one occasion.
“(2) He or she violates § 26-15-3 and in so doing also violates a court order concerning the parties or injunction.
“(3) He or she violates the provisions of § 26-15-3 which causes serious physical injury, as defined in § 13A-1-2, to the child.”
Assuming, without deciding, that aggravated child abuse is a lesser-included offense of capital murder defined in § 13A-5-40(a)(15), there was no rational basis for such an instruction here. There was no factual basis to support the view that although Gobble beat Phoenix, she was not responsible for his death. The only rational conclusion based on the evidence presented was that Gobble abused Phoenix and caused his death or that someone else abused him and caused his death. See Dill v. State, 600 So.2d 343, 360 (Ala.Crim.App.1991). There was no testimony that any intervening act occurred to lessen Gobble’s culpability in the events leading to Phoenix’s death.
“A trial court may refuse to charge on a lesser-included offense only when: (1) it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense; or (2) the charge would tend to mislead or confuse the jury. Turner v. State, 708 So.2d 232, 234 (Ala.Crim.App.l997)(citing Holladay v. State, 549 So.2d 122 (Ala.Crim.App.1988)).”
McClain v. State, 26 So.3d 491, 495 (Ala.Crim.App.2009).
There was no reasonable theory to support an instruction on aggravated child abuse. Accordingly, our holding in Edwards did not compel the circuit court to give a jury instruction on aggravated child abuse as a lesser-included offense.
B.
Gobble next argues that the circuit court’s instructions on intent were erroneous because, she argues, the court instructed the jury that intent may be formed in the “spur of the moment.” Specifically, she asserts that the court’s instructions lessened the State’s burden of proof.
Gobble did not object when this instruction was given. Accordingly, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
We have upheld a court’s jury instructions in a capital case when the court instructed the jury that intent may be formed in the “spur of the moment.” See Sneed v. State, 1 So.3d 104 (Ala.Crim.App.2007). Here, the court gave very specific and detailed instructions on intent and distinguished for the jury the different mental states necessary to convict the defendant of capital murder, manslaughter, and criminally negligent homicide. The circuit court’s instructions on intent did not constitute plain error.
Penalty-Phase Issues XXI.
Gobble next argues that the capital-murder statute under which she was indicted and convicted, § 13A-5-40(a)(15), Ala.Code 1975, is unconstitutional because, she argues, it fails to narrow the class of capital offenders and is arbitrary.
The “Alabama Legislature has repeatedly recognized that children are entitled to certain protections not afforded adults,” and “[t]he child-murder provision is not arbitrary and does not violate any equal protection right.” Ex parte Woodard, 631 So.2d 1065, 1072-73 (Ala.Crim.App.1993). See MacEwan v. State, 701 So.2d 66, 71 *976 (Ala.Crim.App.1997). Other jurisdictions have also upheld similar legislation against the claim that the statutes are arbitrary. See Gray v. Commonwealth, 274 Va. 290, 310, 645 S.E.2d 448, 461 (2007) (“[Subsection (12) [killing of a person under the age of 14 by a person age 21 or older] meets a rational basis for inclusion in Virginia’s capital murder statute as it provides for only specific and limited types of murder to qualify as capital murder.”); Styron v. Johnson, 262 F.3d 438, 452 (5th Cir.2001) (“Murdering a child under six is a sufficiently narrow statutory aggravating factor.”); Black v. State, 26 S.W.3d 895, 897 (Tex.Crim.App.2000) (“[C]hild capital-murder provision is rationally related to the government’s interest in protecting young children” and is not arbitrary.).
Section 13A.-5-40(a)(15), Ala.Code 1975, is not unconstitutional because it fails to narrow the class of capital offenders.
XXII.
Gobble asserts that her sentence was imposed in violation of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), and Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). She raises several different arguments in regard to this claim.
The United States Supreme Court in Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), held that any fact that increases a punishment above the statutory maximum must be presented to a jury and proven beyond a reasonable doubt. That holding was extended to death-penalty cases in Ring v. Arizona. In Caldwell v. Mississippi, the United States Supreme Court held that “[i]t is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant’s death rests elsewhere.” 472 U.S. at 328-29.
A.
First, Gobble argues that according to federal law the jury was required to weigh the aggravating and the mitigating circumstances and that, “[bjecause the weighing process must be found by the jury, all jury findings leading to that determination, including the existence of mitigating circumstances, necessarily are binding on the trial court.” (Gobble’s brief, at pp. 114-15.)
In Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), the Alabama Supreme Court held: “[T]he determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense. Consequently, Ring and Apprendi do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.” 859 So.2d at 1190.
In this case, the jury completed a verdict form, which stated: “We, the jury, find that the aggravating circumstance of ‘heinous, atrocious, or cruel’ exists beyond a reasonable doubt.” (C. 261.) This finding by the jury made Gobble eligible for the death penalty; thus, there was no Ring violation.
B.
Second, Gobble argues that the jury’s nonunanimous recommendation of death was insufficient to support a sentence of death. The jury, by a vote of 10 to 2, recommended that Gobble be sentenced to death.
“Irvin argues that Ring requires that the jury’s recommendation of death be unanimous. Ring makes no such argument. Moreover, both this Court and the Alabama Supreme Court have upheld death sentences imposed after the *977 jury made a non-unanimous recommendation that the defendant be sentenced to death.”
Irvin v. State, 940 So.2d 331, 366 (Ala.Crim.App.2005). See also Newton v. State, 78 So.3d 458 (Ala.Crim.App.2009); Blackmon v. State, 7 So.3d 397 (Ala.Crim.App.2005); Flowers v. State, 922 So.2d 938 (Ala.Crim.App.2005); Miller v. State, 913 So.2d 1148 (Ala.Crim.App.2004). Ring does not require a unanimous recommendation for the death penalty before a defendant may be sentenced to death.
C.
Third, Gobble argues that her death sentence violates Caldwell v. Mississippi because, she argues: “Where the jury’s determination as to the existence of an aggravating circumstance is binding on the trial court, the reliability of that determination is unconstitutionally undermined if the jury is wrongly told that its penalty phase determination is a recommendation or advisory in nature.” (Gobble’s brief, p. 117.)
“We have repeatedly stated that a trial court does not diminish the jury’s role by stating that its verdict in the penalty phase is a recommendation or an advisory verdict. Taylor v. State, 666 So.2d 36 (Ala.Cr.App.1994), on remand, 666 So.2d 71 (Ala.Cr.App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996); Burton v. State, 651 So.2d 641 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995); White v. State, 587 So.2d 1218 (Ala.Cr.App.1990), aff'd, 587 So.2d 1236 (Ala.1991), cert. denied, 502 U.S. 1076, 112 S.Ct. 979, 117 L.Ed.2d 142 (1992).”
Smith v. State, 795 So.2d 788, 837 (Ala.Crim.App.2000). Moreover, “Ring does not address the advisory nature of a jury’s sentencing recommendation.” Duke v. State, 889 So.2d 1, 43 n. 4 (Ala.Crim.App.2002), vacated on other grounds, 544 U.S. 901, 125 S.Ct. 1588, 161 L.Ed.2d 270 (2005).
The circuit court did not diminish the jury’s role in the penalty phase.
XXIII.
Gobble argues that evolving standards of decency have rendered Alabama’s method of performing lethal injection unconstitutional.[10] She cites the article, Leonidas G. Koniaris, Inadequate Anaesthesia in Lethal Injection for Execution, 365 Lancet 1412 (2005), to support her argument. This study was based on the improper administering of the first drug — sodium thiopental — which acts as an anaesthesia. The United States Supreme Court cited this study in Baze v. Rees, 553 U.S. 35 n. 2, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008). Alabama’s method of performing lethal injection, a three-drug protocol, is substantially similar to the one considered by the United States Supreme Court in Baze v. Rees.
The Alabama Supreme Court in Ex parte Belisle, 11 So.3d 323 (Ala.2008), held that Alabama’s method of performing le *978 thal injection does not constitute cruel and unusual punishment. The Court stated:
“The Eighth Amendment to the United States Constitution provides: ‘Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.’ ‘Punishments are cruel when they involve torture or a lingering death; but the punishment of death is not cruel within the meaning of that word as used in the constitution. It implies there something inhuman and barbarous, — something more than the mere extinguishment of life.’ In re Kemmler; 136 U.S. 436, 447, 10 S.Ct. 930, 34 L.Ed. 519 (1890). However, as the Supreme Court of the United States recently stated in Baze v. Rees, 553 U.S. 35, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008):
“ ‘Our cases recognize that subjecting individuals to a risk of future harm— not simply actually inflicting pain— can qualify as cruel and unusual punishment. To establish that such exposure violates the Eighth Amendment, however, the conditions presenting the risk must be “sure or very likely to cause serious illness and needless suffering,” and give rise to “sufficiently imminent dangers.” Helling v. McKinney, 509 U.S. 25, 33, 34-35 (1993) (emphasis added). We have explained that to prevail on such a claim there must be a “substantial risk of serious harm,” an “objectively intolerable risk of harm” that prevents prison officials from pleading that they were “subjectively blameless for purposes of the Eighth Amendment.” Farmer v. Brennan, 511 U.S. 825, 842, 846, and n. 9 (1994).’
“553 U.S. at 49-50, 128 S.Ct. at 1530-31.
“In Baze, two death-row inmates challenged Kentucky’s use of the three-drug protocol, arguing ‘that there is a significant risk that the procedures will not be properly followed — in particular, that the sodium thiopental will not be properly administered to achieve its intended effect — resulting in severe pain when the other chemicals are administered.’ 553 U.S. at 49, 128 S.Ct. at 1530. Beli-sle’s claim, like the claims made by the inmates in Baze, ‘hinges on the improper administration of the first drug, sodium thiopental.’ Baze, 553 U.S. at 53, 128 S.Ct. at 1533.
“The Supreme Court upheld the constitutionality of Kentucky’s method of execution, Baze, 553 U.S. at 62-64, 128 S.Ct. at 1538, and noted that ‘[a] State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.’ Baze, 553 U.S. at 61, 128 S.Ct. at 1537. Justice Ginsburg and Justice Souter dissented from the main opinion, arguing that ‘Kentucky’s protocol lacks basic safeguards used by other States to confirm that an inmate is unconscious before injection of the second and third drugs.’ Baze, 553 U.S. at 114, 128 S.Ct. at 1567 (Ginsburg, J., dissenting). The dissenting Justices recognized, however, that Alabama’s procedures, along with procedures used in Missouri, California, and Indiana ‘provide a degree of assurance — missing from Kentucky’s protocol — that the first drug had been properly administered.’ Baze, 553 U.S. at 121, 128 S.Ct. at 1571 (Ginsburg, J., dissenting).
“The State argues, and we agree, that Belisle, like the inmates in Baze, cannot meet his burden of demonstrating that Alabama’s lethal-injection protocol poses a substantial risk of harm by asserting the mere possibility that something may go wrong. ‘Simply because an execution *979 method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of “objectively intolerable risk of harm” that qualifies as cruel and unusual.’ Baze, 558 U.S. at 50, 128 S.Ct. at 1581. Thus, we conclude that Alabama’s use of lethal injection as a method of execution does not violate the Eighth Amendment to the United States Constitution.”
11 So.3d at 338-39. Alabama’s method of performing lethal injection is not cruel and unusual.
XXIV.
Gobble next argues that the circuit court erred in not allowing defense counsel to present mitigating evidence. Specifically, Gobble argues that counsel was unlawfully prevented from making references to the Bible in his closing argument in the penalty phase.
The record shows that during defense counsel’s closing argument, the following occurred:
“[Defense counsel]: What does the Bible tell us about revenge? And let me tell you this—
“[Prosecutor]: I object the reference to the Bible. That is improper argument. “The Court: Sustained.
“[Defense counsel]: Let me tell you about revenge. Does revenge belong to us? It does not. Who does it belong to?
“[Prosecutor]: Objection. You just sustained it. And he goes back and starts—
“[Defense counsel]: I’m not talking about the Bible, Judge. I’m talking about morality.
“The Court: Sustained. I understand.”
(R. 987.) Gobble asserts that the circuit court erred in not allowing counsel to make the above argument. She cites Ex parte Waldrop, 459 So.2d 959 (Ala.1984), to support her assertion.
Gobble mischaracterizes this issue. Gobble was not prevented from presenting any mitigating evidence. Arguments of counsel are not evidence. See Sneed v. State, 1 So.3d 104 (Ala.Crim.App.2007).
Also, although some states forbid any biblical references in closing arguments— State v. Berry, 141 S.W.3d 549 (Tenn.2004), and Fontenot v. State, 881 P.2d 69 (Okla.Crim.App.1994) — Alabama has recognized that “counsel’s argument should not be so restricted as to prevent reference, by way of illustration, ... to principles of divine law or biblical teachings,” Waldrop, 459 So.2d at 963.[11] However, we have also held that the discretion to argue biblical references is not unlimited. In Welcher v. State, 504 So.2d 360 (Ala.Crim.App.1987), we stated:
“The disputed portion of the appellant’s closing statement is as follows, ‘The State asked y’all to cast the stone. Those among you who are within [sic] sin cast that stone.’ (R. 355) Although it is true that quotations from the Bible are generally allowed during closing arguments, see, e.g., Wright v. State, 279 Ala. 543, 188 So.2d 272 (1966), it is clear that the statement made here went beyond the ‘wide latitude’ allowed counsel in closing arguments. See Sanders v. State, 426 So.2d 497 (Ala.Crim.App.1982). We find no abuse of discretion in the trial judge’s actions here since the statement was clearly made in an attempt to have the members of the jury empathize with the defendant. Montgomery v. State, 446 So.2d 697 (Ala. *980 Crim.App.1983). The trial judge was correct in instructing the jury to disregard counsel’s statement.”
504 So.2d at 363-64.
Defense counsel’s argument was made in an attempt “to have the members of the jury empathize with the defendant.” Welcher, 504 So.2d at 363. Like the court in Welcher, we find that the circuit court did not abuse its considerable discretion in declining to allow defense counsel to make the above-cited argument.
XXV.
Gobble argues that prosecutorial arguments made in the penalty phase denied her a fair trial.
Gobble did not object to any of the challenged instances; thus, we review these claims for plain error. See Rule 45A, Ala.R.App.P, As the Alabama Supreme Court stated in Ex parte Deardorff, 6 So.3d 1235 (Ala.2008):
“[T]rial counsel did not object to the prosecutor’s untimely argument. This failure weighs against the claim of prejudice Deardorff makes on appeal. See Brooks v. State, 973 So.2d 380, 387 (Ala. Crim.App.2007). ‘To rise to the level of plain error, the claimed error must not only seriously affect a defendant’s “substantial rights,” but it must also have an unfair prejudicial impact on the jury’s deliberations.’ Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000).”
6 So.3d at 1244. The standard of review is not whether the defendant was prejudiced, but whether the comment “so infected the trial with unfairness as to make the resulting conviction a denial of due process.” Darden v. Wainwright, 477 U.S. 168, 169, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986).
A.
First, Gobble argues that the prosecutor repeatedly misstated the law in the penalty phase when he argued that the jury was not to consider sympathy in its deliberations and when he made the following comment on Gobble’s mental health: “Come on, people, it used to be a crime was a crime, and a sin was a sin. Now, it’s a syndrome.” (R. 996.)
In upholding a prosecutor’s arguments that the jury should set aside its sympathies, we have stated:
“[I]n Haney v. State, 603 So.2d 368, 394-95 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993), the prosecutor argued to the jury that it should set aside its sympathies in making its decision. This Court held that those comments were proper, stating that they were ‘no more than the prosecutor urging the jury not to be distracted by matters unrelated to the evidence, but to confine itself to the facts and the law.... The prosecutor’s remarks concerning sympathy, sympathy for children, and weaknesses are obvious efforts to prevent the jurors from considering emotional responses not based on the evidence, and they are permitted by [California v.] Brown [, 479 U.S. 538 (1987) ].’ Id. at 394.”
Boyd v. State, 715 So.2d 825, 846 (Ala.Crim.App.1997).
Also, the court on several occasions instructed the jury that arguments of counsel were not evidence in the case. There is no indication that the above arguments seriously affected Gobble’s substantial rights. We cannot say that the prosecutor’s arguments so infected the trial with unfairness that Gobble was denied due process. See Darden v. Wainwright, supra.
*981 B.
Next, Gobble argues that the prosecutor misled the jury on the aggravating circumstance that the offense was especially heinous, atrocious, or cruel when he made the following argument:
“The law in Alabama on what is heinous, atrocious, and cruel, the definition is that you inflicted pain, that you are evil, you are wicked, you inflicted the pain for pure disdain to human life, that it’s shockingly evil, it’s wicked. And the judge will charge you and tell you what that means.”
(R. 844.)
The prosecutor’s argument was consistent with Alabama law on the definition of the “heinous, atrocious, or cruel” aggravating circumstance. See Ex parte Kyzer, 399 So.2d 330 (Ala.1981). The argument was not improper.
C.
Third, Gobble argues that the prosecutor misled the jury on expert testimony when he made the following argument in closing:
“Let’s look at, once again, Dr. Ghostly when he talks about — this is his report. This is what they have brought to you. Dr. Ghostly has not a lot of credibility any more. I disagree with [defense counsel]. You don’t need no experts. You have to follow the Constitution.”
(R. 997.) We cannot say that this argument so infected the trial with unfairness that Gobble was denied due process. See Darden v. Wainwright, supra.
XXVI.
Gobble argues that the circuit court erred in prohibiting the jury from considering “residual doubt” as a mitigating circumstance in the penalty phase. Specifically, she argues that residual doubt is a circumstance under § 13A-5-52, Ala. Code 1975, that may be considered by the jury in sentencing.[12]
There was no objection to this issue; therefore, we review this claim for plain error. See Rule 45A, Ala.R.App.P.
Recently, the Alabama Supreme Court considered the role of “residual doubt” in the penalty phase of a capital-murder trial. The Court stated:
“Section 13A-5-51, Ala.Code 1975, without limiting possible mitigating circumstances, statutorily defines a number of mitigating circumstances. Residual doubt as to the defendant’s guilt is not a statutory mitigating circumstance. Instead, as the State argues, ‘all seven statutory mitigating circumstances [in § 13A-5-51] relate to the defendant or the circumstances of the crime for which the defendant [has been found guilty] and merely reduce the defendant’s culpability for committing that crime.’ State’s brief, at 29.
“Section 13A-5-52, Ala.Code 1975, allows a capital defendant to offer mitigating circumstances in addition to those enumerated in § 13A-5-51. Specifically, it provides:
‘“In addition to the mitigating circumstances specified in Section 13A-5-51, mitigating circumstances shall include any aspect of a defendant’s character or record and any of the *982 circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstances which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.’
“It is inarguable, as the Court of Criminal Appeals has pointed out on many occasions, that residual doubt is not a factor about the ‘defendant’s character or record [or] any of the circumstances of the offense.’ See, e.g., Melson v. State, 775 So.2d 857, 899 (Ala.Crim.App.1999), aff'd, 775 So.2d 904 (Ala.2000). Indeed, as the State argues, residual doubt ‘is nothing more than a juror’s state of mind and bears directly on the defendant’s guilt, [and] is not a fact or situation relating to the defendant’s character or record or which reduces the defendant’s culpability in the commission of a crime for which guilt is a foregone conclusion.’ State’s brief, at 25.
“According to Lewis, the language § 13A-5-52 providing that ‘mitigating circumstances shall include ... any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death’ is broad enough to allow the consideration of residual doubt at the penalty phase of a capital-murder trial. It is not, however, because residual doubt is not a ‘relevant mitigating circumstance.’
“A mitigating circumstance is ‘[a] fact or situation that does not bear on the question of a defendant’s guilt but is considered ... in imposing punishment and esp. in lessening the severity of a sentence.’ Black’s Law Dictionary 260 (8th ed. 2004). As previously stated in this opinion, residual doubt bears directly on the question of a defendant’s guilt. In fact, Lewis admits as much: ‘Residual doubt arises because even though the evidence the juror saw was enough to convict, there is a possibility that ... the defendant is really innocent.’ Lewis’s reply brief, at 13. Also, residual doubt is not a ‘fact or situation.’ Instead, it is merely ‘a lingering uncertainty about facts, a state of mind that exists somewhere between “beyond a reasonable doubt” and “absolute certainty”’. Franklin v. Lynaugh, 487 U.S. 164, 188, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (O’Connor, J., concurring). Stated simply, Lewis’s arguments find no support in Alabama’s statutory provisions addressing mitigating circumstances.
“Residual doubt is not a mitigating circumstance. Consequently, the Court of Criminal Appeals was correct in holding that the trial court did not err in denying Lewis’s requested jury charge on residual doubt during the penalty phase of Lewis’s capital-murder trial.”
Ex parte Lewis, 24 So.3d 540, 543-44 (Ala.2009). Accordingly, we find no plain error in regard to this claim.
XXVII.
Gobble argues that the' circuit court erroneously found that the murder was especially heinous, atrocious, or cruel, § 13A-5-49(8), Ala. Code 1975, as compared to other capital murders. She further asserts that the circuit court’s sentencing order fails to make specific findings of fact concerning this aggravating circumstance.
The Alabama Supreme Court in Ex parte Kyzer held that the heinous, atrocious, or cruel aggravating circumstance was meant to apply “to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.” 399 So.2d at 334. The factors to consider *983 in determining whether that aggravating circumstance exists are set out by the Alabama Supreme Court in Ex parte Key, 891 So.2d 384 (Ala.2004) — (1) psychological torture; and (2) suffering after the initial assault.
The circuit court stated the following in its sentencing order:
“The Court finds that the State proved beyond a reasonable doubt the existence of the following circumstances:
“(1) The capital offense was especially heinous, atrocious, and cruel compared to other capital offenses. See Code of Alabama, Section 13A-5-40.
“The jury’s verdict establishes the existence of this aggravating circumstance in an unanimous vote and the evidence supports the verdict.”
(C. 275.) This was the only aggravating circumstance the trial court found to exist.
Section 18A-5-47(d), Ala.Code 1975, requires that “[t]he trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49 ...” Here, the circuit court did not make specific findings of facts concerning all the aggravating circumstances set out in § 13A-5-49, Ala.Code 1975.[13] Also, as noted above, the circuit court failed to make specific findings of fact consistent with Ex parte Kyzer, concerning the aggravating circumstance that the murder was especially heinous, atrocious, or cruel when compared with other capital offenses. In Miller v. State, 913 So.2d 1148 (Ala.Crim.App.2004), we remanded a similar case and stated:
“The court’s order fails to comply with Ex parte Kyzer, because the trial court failed to make specific findings of fact as to why it believed that this aggravating circumstance existed. Although the circuit court made findings of fact in another part of its three-part sentencing order, those facts do not establish specific findings addressing the standard set forth in Ex parte Kyzer. See, e.g., Stallworth v. State, 868 So.2d 1128, 1168 (Ala.Crim.App.2001).”
913 So.2d at 1152. See McGowan v. State, 990 So.2d 931 (Ala.Crim.App.2003); Turner v. State, 924 So.2d 737 (Ala.Crim.App.2002).
By remanding this case to the circuit court, we do not wish to be understood as implying that this murder was not especially heinous, atrocious, or cruel when compared to other capital murders. “We have consistently held that brutal beatings that result in death meet the definition of especially heinous, atrocious, or cruel.” Blackmon v. State, 7 So.3d 397, 420 (Ala.Crim.App.2005). Rather, remand is required because the circuit court’s order fails to comply with § 13A-5-47(d), Ala. Code 1975, and with Ex parte Kyzer. Thus, we must remand this case to the circuit court for that court to correct these deficiencies in its sentencing order.
Accordingly, this case is hereby remanded to the Houston County Circuit Court for the circuit court to make specific findings of fact concerning each aggravating circumstance set out in § 13A-5-49, Ala. Code 1975, and to make specific findings of facts, consistent with the requirements of *984 Ex parte Kyzer concerning the aggravating circumstance set out in § 13A-5-49(8), Ala.Code 1975. The circuit court should then reweigh the aggravating and the mitigating circumstances and resen-tence Gobble. See Spencer v. State, 58 So.3d 215 (Ala.Crim.App.2008). Due return should be filed in this Court within 42 days from the date of this opinion.
AFFIRMED AS TO CONVICTION; REMANDED WITH DIRECTIONS AS TO SENTENCING.
WELCH and KELLUM, JJ., concur. WISE, P.J., and WINDOM, J., concur in the result.

On Return to Remand

MAIN, Judge.
The appellant, Tierra Capri Gobble, was convicted of intentionally murdering her 4-month-old son, Phoenix Parrish, an offense defined as capital by § 13A-5-40(a)(15), Ala.Code 1975, because Phoenix was under the age of 14. The circuit court sentenced Gobble to death. This Court affirmed her conviction and remanded the case to the circuit court for it to correct its sentencing order to make specific findings of facts concerning each aggravating circumstance set out in § 13A-5-49, Ala.Code 1975, and to make specific findings of fact concerning the application of the aggravating circumstance that the murder was especially heinous, atrocious, or cruel when compared to other capital murders. See Gobble v. State, 104 So.3d 920 (Ala.Crim.App.2010). This case is now before this Court on return to remand.
Gobble argues that the circuit court failed to fully comply with our instructions because, she asserts, the court failed to make specific findings of fact concerning nine of the aggravating circumstances enumerated in § 13A-5-49, Ala. Code 1975. In our original opinion, we noted that it would be harmless error for a circuit court not to make specific findings of facts on all the statutory aggravating circumstances when that defect was the only defect in the sentencing order. Because it was necessary to remand this case for another reason, we also directed the court to make specific findings of fact concerning all 10 of the statutory aggravating circumstances. For the following reasons and in the interest of judicial economy, it is unnecessary to remand this case a second time. As we explained in Fortenberry v. State, 545 So.2d 129 (Ala.Crim.App.1988):
“[T]his Court has, on several occasions, remanded cases with instructions for the trial court to correct the sentencing order to include specific findings of fact regarding those aggravating circumstances in § 13A-5-49, Ala. Code 1975, that it had found not to exist. However, in those cases, there were additional defects in the sentencing order that required a remand other than the failure to include specific findings regarding the aggravating circumstances that did not exist. See, e.g., Ziegler v. State, 886 So.2d 127 (Ala.Crim.App.2003) (remanding case because the trial court failed to make specific findings of fact regarding the mitigating circumstances that it had found not to exist as well as the aggravating circumstances it had found not to exist); Turner v. State, 924 So.2d 737 (Ala.Crim.App.2002) (remanding case because the trial court’s findings regarding certain mitigating circumstances were erroneous as well as because the court had failed to make specific findings of fact regarding those aggravating circumstances it had found not to exist); Key v. State, 891 So.2d 353 (Ala.Crim.App.2002) (remanding case because the trial court failed to make specific findings of fact regarding the mitigating circumstances that it had found not to exist *985 as well as the aggravating circumstance it had found not to exist); McNabb v. State, 887 So.2d 929 (Ala.Crim.App.2001) (same); and Clark v. State, 896 So.2d 584 (Ala.Crim.App.2000) (remanding case for the trial court to enter specific written findings summarizing the crime and the defendant’s participation in it, regarding the existence or nonexistence of each mitigating circumstance in § 13A-5-51, Ala. Code 1975, as well as regarding the nonexistence of aggravating circumstances).”
545 So.2d at 144.
In applying the a harmless-error analysis to a circuit court’s failure to make specific findings of facts concerning each aggravating circumstances enumerated in § 13A-5-49, Ala.Code 1975, we further noted in Fortenberry:
“While the trial court’s sentencing order is defective, the errors are not so egregious or substantial as to require a new sentencing order. ‘The sole purpose of requiring that the trial judge, as the sentencing authority, make a written finding of the aggravating circumstance is to provide for appellate review of the sentence of death.’ Ex parte Kyzer, 399 So.2d 330, 338 (Ala.1981). ‘[T]he harmless error rule does apply in capital cases at the sentence hearing.’ Ex parte Whisenhant, 482 So.2d 1241, 1244 (Ala.1983). ‘As long as the trial judge properly exercises his discretion and the facts indicating the death penalty are ‘so clear and convincing that virtually no reasonable person could differ,’ a harmless error analysis can be used.’ Baldwin v. State, 456 So.2d 117, 126 (Ala.Cr.App.1983), affirmed, Ex parte Baldwin, 456 So.2d 129, 140 (Ala.1984). See also Barclay v. Florida, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983); Thompson v. State, 503 So.2d 871, 881 (Ala.Cr.App.1986), affirmed, Ex parte Thompson, 503 So.2d 887 (Ala.), cert. denied, Thompson v. Alabama, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987). We emphasize that ‘the safer practice would have been for the trial judge to simply follow the verbiage of the statute in negating aggravating circumstances.’ Berard v. State, 402 So.2d 1044, 1051 (Ala.Cr.App.1980).”
545 So.2d at 144. See also Saunders v. State, 10 So.3d 53 (Ala.Crim.App.2007); Gavin v. State, 891 So.2d 907 (Ala.Crim.App.2003); Stewart v. State, 730 So.2d 1203 (Ala.Crim.App.1996).
In this case, the circuit court stated the following in its sentencing order: “No other aggravating circumstance as enumerated by statute was found to exist.” (C.R. 275.) Thus, the circuit court’s “technical omission” in failing to make specific findings of fact on all of the statutory aggravating circumstances is harmless and does not warrant a second remand by this Court.
Gobble next asserts that the aggravating circumstance that the murder was especially heinous, atrocious, or cruel when compared to other capital murders was erroneously applied in this case.
On remand, the circuit court stated the following findings concerning this aggravating circumstance:
“[T]he offense was committed upon a small child (four months old) by striking his head against a hard surface causing trauma [and] internal injuries. The victim’s fourth, fifth, and sixth ribs were fractured. Bleeding was observed between the scalp and skin as well as between the skull and brain. This act by a mother shocks the conscience of this Court. This was a callous and calculated act and, in this Court’s opinion, was especially cruel, heinous and atrocious as compared to other capital of *986 fenses. This was a brutal beating that caused tremendous pain and suffering upon this small child, who was helpless and unable to defend himself. The mother-Defendant, Tierra Gobble, was not supposed to be around the child because the State of Florida had given custody of the child to Mr. Parrish, a roommate of the defendant, due to her abuse and neglect. Apparently, the pattern of abuse and neglect continued until she ended the life of this small child. Her last fateful act on the small child only showed her total disregard of any feelings for her own child and demonstrates very clearly why the jury’s unanimous verdict of especially heinous, atrocious and cruel as compared to other capital offenses was correct and supported by the evidence.
“This Court has weighed this aggravating circumstance along with the mitigating circumstances that were found to exist, and finds that the aggravating circumstance as described above outweighs the mitigating circumstances, and the appropriate sentence for this crime is death.”
(C.R. 123-24.)
In reviewing the application of this aggravating circumstance, we have stated:
“The Alabama appellate courts’ interpretation of ‘especially heinous, atrocious, or cruel’ has passed muster under the Eighth Amendment because those courts have consistently defined the term to include only ‘those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.’ Ex parte Clark, [728 So.2d 1126 (Ala.1998) ], citing, Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir.1989).”
Taylor v. State, 808 So.2d 1148 (Ala.Crim.App.2000). “In this determination we must consider whether the violence involved in achieving the killing went beyond what was necessary to cause death, whether the victims experienced appreciable suffering after a swift assault, and whether there was psychological torture.” Brownfield v. State, 44 So.3d 1, 41 (Ala.Crim.App.2007).
“We have consistently held that brutal beatings that result in death meet the statutory definition of especially heinous, atrocious, or cruel. See Brooks v. State, 695 So.2d 176 (Ala.Crim.App.1996), aff'd, 695 So.2d 184 (1997); Smith v. State, 795 So.2d 788 (Ala.Crim.App.2000); Ashley v. State, 651 So.2d 1096 (Ala.Crim.App.1994); McGahee v. State, 632 So.2d 976 (Ala.Crim.App.), aff'd, 632 So.2d 981 (Ala.1993); Freeman v. State, 555 So.2d 196 (Ala.Crim.App.1988). Other states have also found that brutal beatings that result in death are especially heinous. See State v. Gerlaugh, 135 Ariz. 89, 659 P.2d 642 (1983) (brutal beating lasting 15 minutes was sufficient to satisfy aggravating circumstance that the murder was committed in an especially heinous, cruel, or depraved manner); Scott v. State, 494 So.2d 1134, 1137 (Fla.1986) (‘The brutal senseless beatings which the victim was forced to endure further set this crime apart from the norm of capital felonies and clearly reflect the conscienceless, pitiless and unnecessarily torturous nature of this crime.’); State v. Sepulvado, 672 So.2d 158 (La.1996).”
Blackmon v. State, 7 So.3d 397, 421 (Ala.Crim.App.2005). A victim’s age and physical condition are relevant when assessing this aggravating circumstance. See Brown v. State, 982 So.2d 565, 607 (Ala.Crim.App.2006).
Dr. Jonas Saíne testified that each of the numerous injuries inflicted on Phoenix would have caused him great pain. Phoenix had blunt-force injuries to his head, *987 several fractured ribs, a fracture to his right arm, fractures to both wrists, multiple bruises on his face, head, neck, and chest, and a tear in the inside of his mouth that was consistent with having a bottle shoved into his mouth. The broken ribs, he said, would have caused Phoenix tremendous pain every time he breathed, which for a baby, he said, was 20 or 30 times a minute. Dr. Saíne further testified that a child of Phoenix’s age would be unable to help himself. He also said that some of Phoenix’s injuries were in various stages of healing. The cause of death, Dr. Saíne testified, was a subdural hematoma which, he described, “is a medical term for a blood clot that forms between the inside of the skull and the brain tissue. And then this causes sufficient pressure which then disrupts the entire brain system, which ultimately will lead to death, if not treated.” (R. 460.) The injuries, he testified, did not occur from one specific act but were from more than one act. There was evidence indicating that Phoenix’s injuries occurred during the middle of the night and Gobble testified that Phoenix was alive at around 9:00 a.m. when she checked on him. There was evidence indicating that the victim suffered for an appreciable period before his untimely death. “The cruelty exercised upon [Phoenix] is clearly demonstrated by the nature and extent of his physical injuries. These injuries caused [Phoenix] intense and severe pain before he died. The physical abuse and neglect were significantly more ruthless than that required to commit murder.” Ward v. State, 814 So.2d 899, 924 (Ala.Crim.App.2000). The circuit court correctly found that Phoenix’s murder was especially heinous, atrocious, or cruel when compared to other capital murders.
In accordance with § 13A-5-53, Ala.Code 1975, we must address the propriety of Gobble’s conviction and sentence of death. Gobble was convicted of murdering her four-month-old son, Phoenix, an offense defined as capital by § 13A-5-40(a)(15), Ala. Code 1975.
The record reflects that Gobble’s sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See § 13A-5-53 (b)(1), Ala. Code 1975.
The circuit court found that the aggravating circumstance outweighed the mitigating circumstances. The court found as the sole aggravating circumstance that the murder was especially heinous, atrocious, or cruel as compared to other capital murders. See § 13A-5-49(8), Ala.Code 1975. The circuit court found as statutory mitigating circumstances that Gobble had no significant history of prior criminal activity, § 13A-5-51(l); that the murder was committed while Gobble was under the influence of extreme mental or emotional disturbance, § 13A — 5—51 (2); and that Gobble acted under extreme duress or under the substantial domination of another person, § 13A-5-51(5). The circuit court found the following nonstatutory mitigating circumstances:
“(1) Ms. Gobble suffers from Attention Deficit Hyperactivity Disorder; and, further, Ms. Gobble was diagnosed and treated by two different psychiatrists in Lakeland, Florida, and was prescribed Ritalin and Adderall to treat her hyperactivity;
“(2) Ms. Gobble [was born and] ... tested positive for marijuana and methamphetamine;
“(3) Ms. Gobble was raised in an abusive environment and, in fact, both Tier-ra Gobble’s mother, Lori Gobble, and her stepfather at that time, Dallas Gobble, admit that the two of them ‘fought like cats and dogs....;
“(4) Domestic violence occurring between Ms. Gobble’s mother and stepfa *988 ther during the time they were married (approximately eight years) was so severe that the Navy ordered Dallas Gobble, the stepfather, to attend marriage counseling as a condition of Dallas Gobble’s being able to remain in the Navy;
“(5) During the time when Tierra was ten years old, Tierra’s mother, Lori Gobble, abandoned Tierra and Tierra’s brother, Dallas, Jr., to go live with a boyfriend;
“(6) During Tierra’s childhood, after her younger brother, Dallas, Jr., was born, Tierra was frequently saddled with the sole responsibility of caring for her younger brother because her mother was not in the household or her mother placed the responsibility of caring for Dallas, Jr., on Tierra;
“(7) On an occasion during Tierra’s childhood, she was stabbed in the hand with a fork by her mother, Lori Gobble, because Lori Gobble believed Tierra was reaching for too many pieces of bread;
“(8) Tierra’s grandparents, Beth and Bordie Gobble, upon checking on Tierra and her younger brother Dallas, Jr., found animal and human feces throughout the house and discovered that the toilet was not working because it was stopped up; and Tierra was alone with Dallas, Jr., trying to be the parent. This occurred when Tierra was approximately eleven years old; and, further at this time in the house, Tierra was discovered to have bruises on her and the house was infested with roaches;
“(9) During Tierra’s childhood, when she was about eleven or twelve, Tierra’s mother, Lori, would bring men home with her and have sex with the men in the house;
“(10) Tierra Gobble, from age twelve until her high school graduation at age nineteen, received no contact or communication from her mother, and after that, her mother had no contact with her until Tierra was arrested for capital murder;
“(11) Ms. Gobble was born into and grew up in a neglectful, abusive and dangerous environment;
“(12) From the time she was eight months old until she was ten years old, Ms. Gobble witnessed severe and pervasive violence by her parents. She was never offered any protection from the recurring domestic violence;
“(13) Ms. Gobble experienced emotional and financial neglect and abuse. During this period of time, the children had very little to eat, stayed in a violent environment and were not able to establish an enduring pattern of protection and security;
“(14) Ms. Gobble was' a victim of physical abuse primarily from her mother throughout most of her childhood. There was emotional abuse as well in this environment;
“(15) As a result of the above four factors, Ms. Gobble internalized the violence and neglect she witnessed and experienced creating an internal emotional environment of depression that she was unable to cope with. In addition to depression she very likely experienced anxiety and severe emotional trauma that she tried to repress;
“(16) Ms. Gobble’s unresolved childhood issues apparently exacerbated into post-partem depression. She did not learn appropriate coping skills as a child so she internalized her worry and anger causing depression symptoms;
“(17) There does not appear to be any pre-meditation in the commission of the offense but rather an impulsive, thoughtless response to stress while she was in the throes of a post-partem depression. This response was the culmination of a lifetime of mistreatment and trauma that Tierra experienced;
*989 “(18) Ms. Gobble suffered as a child and continues to suffer today as an adult from Attention [Deficit] Hyperactivity Disorder.”
(C.R. 277-79.) On remand, the circuit court reweighed the aggravating circumstance against the mitigating circumstances and found that the aggravating circumstance outweighed the mitigating circumstances and sentenced Gobble to death.
Gobble argues that the circuit court erred in finding that one aggravating circumstance outweighed “over twenty mitigating circumstances.”
Section 13A-5-48, Ala.Code 1975, provides:
“The process described in Sections 13A-5-46(e)(2), 13A-5-46(e)(3) and Section 13A-5-47(e) of weighing the aggravating and mitigating circumstances to determine the sentence shall not be defined to mean a mere tallying of aggravating and mitigating circumstances for the purpose of numerical comparison. Instead, it shall be defined to mean a process by which circumstances relevant to sentence are marshalled and considered in an organized fashion for the purpose of determining whether the proper sentence in view of all the relevant circumstances in an individual case is life imprisonment without parole or death.”
“The determination of whether the aggravating circumstances outweigh the mitigating circumstances is not a numerical one, but instead involves the gravity of the aggravation as compared to the mitigation.” Ex parte Clisby, 456 So.2d 105, 108-09 (Ala.1984). “[W]hile the existence of an aggravating or mitigating circumstance is a fact susceptible to proof, the relative weight of each is not; the process of weighing, unlike facts, is not susceptible to proof by either party.” Lawhorn v. State, 581 So.2d 1159, 1171 (Ala.Crim.App.1990). Clearly, the circuit court gave the mitigating circumstances little weight in light of the brutal and heinous aggravating circumstance that was present in this case. “The weight to be attached to the aggravating and the mitigating evidence is strictly within the discretion of the sentencing authority.” Smith v. State, 908 So.2d 273, 298 (Ala.Crim.App.2000). We agree with the circuit court’s findings.
Section 13A-5-53(b)(2), Ala.Code 1975, provides that this Court must independently weigh the aggravating circumstance against the mitigating circumstances. After independently weighing these circumstances, we are convinced that death was the appropriate sentence for Gobble’s horrific actions that ultimately led to the untimely death of her four-month-old son.
Neither is Gobble’s sentence disproportionate nor excessive to sentences imposed in other capital convictions for similar murders, § 13A-5-53(b)(3), Ala.Code 1975. See Johnson v. State, 40 So.3d 753 (Ala.Crim.App.2009) (death sentence imposed for murder of six-month-old son); Blackmon v. State, 7 So.3d 397 (Ala.Crim.App.2005) (death sentence imposed for murder of two-year-old daughter); Broadnax v. State, 825 So.2d 134 (Ala.Crim.App.2000) (death sentence imposed for murder of four-year-old child).
Last, we have searched the record for any error that may have adversely affected Gobble’s substantial rights and have found none. See Rule 45A, Ala.R.App.P.
Accordingly, Gobble’s sentence of death is due to be, and is hereby, affirmed.
AFFIRMED.
WISE, P.J., and WELCH, WINDOM, and KELLUM, JJ., concur.

. This case was originally assigned to another judge on the Court of Criminal Appeals; it was reassigned to Judge Main on May 15, 2009.

. Parrish pleaded guilty to manslaughter, aggravated child abuse, and hindering prosecution in Phoenix's death. He was sentenced to concurrent terms of 10 years in prison. Hunter pleaded guilty to manslaughter and child abuse in Phoenix’s death and was sentenced to consecutive terms of 10 years in prison.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. There was actually one statement made on September 15, but a break was taken during the interview.

. A statement is not rendered involuntary because police tell the defendant that making a statement will be the defendant's last opportunity to tell his or her side of the story.
“We are not the first court to consider the type of interrogation practices challenged here. In several cases, courts have determined that police statements to a suspect suggesting he or she has one last chance to talk are not conclusive evidence of coercive questioning. See United States v. Gamez, 301 F.3d 1138, 1144 (9th Cir.2002) (concluding that police statements that 'it would "behoove" ' suspect to tell what he knew and that 'this was his "last chance” to come forward' did not amount to coercion); People v. Wickham, 53 P.3d 691, 696 (Colo.Ct.App.2001) (holding that police statement that 'defendant had one last chance to respond to the questions' was not coercive); State v. Chung, 202 Conn. 39, 519 A.2d 1175, 1183-84 (1987) (characterizing police statements that ‘it may be your first chance and your last chance to straighten it out' and ‘I don’t know that you'll have the opportunity to do it again' as not coercive where no promises or threats were made); State v. Hough, 571 N.W.2d 578, 581 (Minn.Ct.App.1997) (determining that police statements that it was in suspect’s 'best interest’ to talk and that ‘interview would be his only chance to tell his side of the story’ were not promises or misrepresentations and were not coercion), rev'd on other grounds, 585 N.W.2d 393 (Minn.1998).”
State v. Pontbriand, 178 Vt. 120, 132-33, 878 A.2d 227, 236 (2005).

. To protect the anonymity of the jurors, we are using their initials.

. We requested that the circuit clerk forward any juror questionnaires related to this case. The circuit clerk informed this Court that no questionnaires had been distributed. The record shows that at a pretrial-motion hearing Gobble requested that a juror questionnaire be mailed to prospective jurors. The circuit court indicated that it did not like to use questionnaires and that it would examine the proposed questionnaire that had been submitted. (Supplemental record, p. 40.) There is no further discussion about the questionnaires in the record.

.The State’s last strike was a white female. We consider the last strike, one of the alternates, as having been struck for Batson purposes. See Ashley v. State, 651 So.2d 1096, 1099 (Ala.Crim.App.1994).

. Evidence was presented that Hunter was a violent person. Both Dallas and Carmen Gobble, Gobble’s father and stepmother, testified that they had seen Hunter when he was violent.

. Alabama's primary method of execution is lethal injection. Section 15-18-82.1(a), Ala. Code 1975. However, § 15-18-82.1(c), Ala. Code 1975, provides that, if this method is declared unconstitutional, “all persons sentenced to death for a capital crime shall be executed by any constitutional method of execution.” Section 15-18-82.1(h), Ala.Code 1975, further provides: "In any case in which an execution method is declared unconstitutional, the death sentence shall remain in force until the sentence can be lawfully executed by any valid method of execution.”

. “The Eleventh Circuit ... has declined to address whether biblical references are per se improper.” Ford v. Schofield, 488 F.Supp.2d 1258, 1309 n. 17 (N.D.Ga.2007).

. Section 13A-5-52, Ala.Code 1975, states:
"In addition to the mitigating circumstance specified in Section 13A-5-51, mitigating circumstances shall include any aspect of the defendant’s character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death, and any other relevant mitigating circumstance of life imprisonment without parole instead of death."

. Typically, we would not remand this case for the circuit court to make specific findings of facts concerning the aggravating circumstances it found not to exist. See Stewart v. State, 730 So.2d 1203 (Ala.Crim.App.1996) (holding that it was harmless error for circuit court not to make specific findings of fact concerning those aggravating circumstances that it found did not apply in the case). However, because this case is due to be remanded on other grounds we also direct the circuit court to correct this deficiency in its sentencing order.